Julia B. Cherlow - State Bar No. 290538
jcherlow@birdmarella.com
Desiree Moshayedi - State Bar No. 355014
dmoshayedi@birdmarella.com
BIRD, MARELLA, RHOW,
LINCENBERG, DROOKS & NESSIM, LLP
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Plaintiff
Simon Stephenson

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

SIMON STEPHENSON, an individual,

Plaintiff,

vs.

ALEXANDER PAYNE, an individual, DAVID HEMINGSON, an individual, MARK JOHNSON, an individual, GRAN VIA PRODUCTIONS LLC, MIRAMAX, LLC, HONEST SCHOLAR PRODUCTIONS, LLC, MIRAMAX DISTRIBUTION SERVICES, LLC, FOCUS FEATURES LLC, UNIVERSAL PICTURES HOME ENTERTAINMENT LLC, NBCUNIVERSAL MEDIA, LLC, and DOES 1-10 inclusive,

Defendants.

CASE NO.

**COMPLAINT FOR:**

1. Copyright Infringement; and
2. Violations of 17 U.S.C. § 1202.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff Simon Stephenson hereby alleges against Defendants Alexander Payne, David Hemingson, Mark Johnson, Gran Via Productions LLC, Honest Scholar Productions, LLC, Miramax Distribution Services, LLC, Miramax, LLC, Focus Features LLC, Universal Pictures Home Entertainment LLC, NBCUniversal Media, LLC, and DOES 1-10 inclusive (together, "Defendants") as follows, on personal knowledge as to his own acts and on information and belief where so stated:

## NATURE OF THE ACTION

1. In 2012 and early 2013, Simon Stephenson drew on his experiences as a pediatrician to write a screenplay, *Frisco*. Later that year, thirty-nine film executives named it among their favorite unproduced screenplays, placing it third on the 2013 Black List, an annual ranking of Hollywood's most highly regarded unproduced screenplays. Stephenson and his agents sought out Alexander Payne to direct *Frisco*, and the screenplay was sent to him twice. Payne read it in 2013 and again in 2019. Payne passed on both occasions, but in 2022, he finally made Stephenson's screenplay. Under Payne's direction, Stephenson's children's hospital became a boarding school, the cynical pediatrician became a cynical teacher, and the precocious patient became a precocious pupil. The film earned its credited screenwriter career-defining Academy Award and BAFTA nominations, and the Writers Guild Award for Original Screenplay. Unfortunately, that credited screenwriter was not Stephenson, and the film was not called *Frisco*. It was called *The Holdovers*.

2. *Frisco* tells the story of Jeff Willis, a dispirited doctor at a children's hospital who is in trouble with his boss for offending a congresswoman parent, and Amy, the precocious and semi-abandoned teenage patient Willis gets stuck looking after. Their uneasy relationship begins at the hospital and deepens during a trip to San Francisco, as Amy's unwanted company and youthful vitality pull Willis out of the life in which he has become trapped. Valerie, a pharmaceutical representative at

the conference, joins them on their trip and encourages Willis to go easy on the teenager. Back at work, the two say a restrained goodbye, and the now emboldened Willis loses his job when he refuses to placate a pair of aggrieved parents. At the end of the screenplay, changed by Amy, Willis sets out to fulfill an ambition, deferred since college and rooted in their shared interest in the Beat Generation: to drive across America and find "the pearl."

3. *The Holdovers* tells the story of Paul Hunham, a dispirited teacher at a boarding school who is in trouble with his boss for offending a senator parent, and Angus, the precocious and semi-abandoned teenage pupil he gets stuck looking after. Their uneasy relationship begins at the school and deepens during a trip to Boston, as Angus's unwanted company and youthful vitality pull Paul out of the life in which he has become trapped. Mary, the school's cook, joins them on their trip and encourages Paul to go easy on the teenager. Back at the school, the now emboldened Paul loses his job when he refuses to placate a pair of aggrieved parents, and the two say a restrained goodbye. At the end of the film, changed by Angus, Paul sets out to fulfill an ambition, deferred since college and rooted in their shared interest in the ancient world: to go to Carthage and finish his monograph.

4. Stephenson does not claim ownership of the premise of a cantankerous adult and a difficult teenager who become stuck together. What he alleges is a rarer and more sophisticated act of taking: that his particular expression of that premise—his characters, his scenes, their construction, and their order—were meticulously transposed into *The Holdovers*, with surface cosmetic details changed. Screenplays are often called the blueprint for a film. The Defendants built their film using *Frisco* as their blueprint.

5. Contemporaneous correspondence shows that, after reading *Frisco* in 2013, Payne reportedly "loved the writing".[1] More recently, speaking at the

[1] (McNulty email of Oct. 24, 2013 at Exhibit A); *see* Section B, infra.

Sarajevo Film Festival in August 2024, Payne dismissed Stephenson's allegations as "the stupidest thing in the world." Invoking Marcel Pagnol's 1935 French-language film *Merlusse*, Payne declared: "That's where I stole it from – I didn't steal it from that guy."[2] But Payne's admitted theft from *Merlusse* does not excuse his copying *Frisco*.

6. The credited screenwriter of *The Holdovers* is David Hemingson and *The Holdovers* is his first produced feature film. Hemingson received a full producer credit on the film, which *Variety* noted was "a rarity for a screenwriter, let alone a first-timer."[3] The film's director, Alexander Payne, has won two Academy Awards for screenwriting. By both men's accounts, Payne contributed disproportionately to the writing of *The Holdovers*. He supplied the premise, selected among proposed storylines, redirected the story, proposed sending the characters on a road trip, and rewrote portions of the script.

7. The drafts themselves demonstrate Payne's involvement went further still. Five markers of typing and one of software, each measurable in the previous screenplays of both men, separate Payne's hand from Hemingson's. On every one of them, each draft of *The Holdovers* that Stephenson has obtained is typed in Payne's style rather than Hemingson's: the May 2021 Draft, on which, on information and belief, the Film's financing was agreed; the September 2021 Draft, on information and belief, the draft in use as the Film entered pre-production; and, even the 2023 Awards Draft circulated to voters, in which Hemingson's habits first begin to

---

[2] Alexander Payne, Deadline, Aug. 21, 2024, https://deadline.com/2024/08/alexander-payne-the-holdovers-plagiarism-accusations-1236044671/ ("Deadline").

[3] Tatiana Siegel, *Alexander Payne's 'The Holdovers' Accused of Plagiarism by 'Luca' Writer (EXCLUSIVE)*, Variety (Mar. 9, 2024), https://variety.com/2024/film/news/the-holdovers-accused-plagiarism-luca-writer-1235935605/.

appear, and only there in the newly added text.

8. On information and belief, Payne prepared or substantially revised each draft of *The Holdovers*.

9. A director's revisions to a screenplay are common. What *The Holdovers* drafts show is not. Even the opening pages that Hemingson says he wrote in two days and never changed are typed in Payne's style, and the May Draft never once marks a pause with "beat," as Hemingson does thirty-nine times in his two other publicly available screenplays. Who shaped the text matters here because Payne is the person who twice received *Frisco*.

10. The copying of *Frisco* extends from the overall story down to the construction and nuance of individual exchanges. Forty-six incidents correspond across the works, with twenty-four occurring in the same order. Within those scenes, the characters encounter the same obstacles, answer with the same retorts, and arrive at the same reversals. Even the verbal devices recur: a question that traps the man into playing "Dad," a joke about the teenager's failing body answered by a medical emergency, and the teenager's wish to see the city voiced in a matching three-part anaphora, in a conversation Hemingson has said he "reverse engineered." The timing also tracks: pivotal events fall on corresponding story days, and *The Holdovers* skips forward at the point where *Frisco* skips forward, leaving its calendar at odds with its own dialogue.

11. The transposition in *The Holdovers* was performed with precision, but an early draft of the script left behind a telltale detail. In *Frisco*, the doctor and teenager travel to San Francisco for a medical conference. When they get to the conference, the hotel is full because of the conference, prompting a discussion of a suite instead of a single room. In the May 2021 draft of *The Holdovers*, the teenager likewise seeks a hotel room, discusses a single room and then a suite, telling the hotel he is coming to town ***"for a medical conference":***

(Figure – Medical conference line in May draft of *The Holdovers*.)

```
Angus talks on a PAY PHONE.                                40.

                         ANGUS
          Well if you don't have a single
          room, I'll take a junior suite.  I
          understand it's the holidays, but
          it's kind of an emergency.  I'm
          coming into the city for a medical
          conference.
```

12. No medical conference figures in *The Holdovers'* story: its adult protagonist is a teacher, and neither he nor the teenager is traveling to attend a medical conference. The explanation belongs to *Frisco's* plot, and its presence in the May 2021 *The Holdovers* script is evidence that the script was unlawfully copied. Its subsequent removal—while the lines surrounding it remained—is consistent with that copying then being concealed.

13. The "medical conference" fragment is not the only remnant of *Frisco* in *The Holdovers*. A comparison of the earlier drafts shows the minor cosmetic details most likely to reveal *Frisco* being removed, while other revisions bring the screenplay substantively ever closer to it. The three drafts Stephenson has obtained allow that process to be traced from one draft to the next. The earlier drafts—which on information and belief tell even more of the story—remain in Defendants' possession.

14. The Copyright Act reserves to the owner the right to authorize works in which the original is "recast, transformed, or adapted." 17 U.S.C. §§ 101, 106(2). Defendants invaded that right by transposing *Frisco* into *The Holdovers* without Stephenson's permission. Miramax, producer of *The Holdovers*, knows perfectly well that a change of scenery does not make a screenplay original. Its remake of *Shall We Dance?* moved the story from Tokyo to Chicago and turned an accountant into a lawyer. Miramax called it a remake and credited the original filmmaker, Masayuki Suo. But when Defendants took Stephenson's work, they neither obtained

his permission nor gave him credit.

15. Consider the institutional confrontations that frame both stories. Early in both works, the man is summoned to his supervisor, praised for his ability, and criticized for his treatment of a child whose parent is a politician. He answers with an insult about the family's intelligence; and appeals to his boss by first name: *Frisco*: "Come on, Margaret." *The Holdovers*: "Come on, Hardy." The supervisor invokes the institution's interests, and the teenager later turns the man's precarious professional position into leverage over him. Near the end of both works, the man is summoned again and faces his supervisor and a pair of aggrieved parents seeking a specific concession. His answers harden into provocation; the supervisor rebukes him with a single word—his name: "Jeff"; "Hunham!" Emboldened by his time with the teenager, the man stays true to his morals at the cost of his job. Once the consequence is announced and he is asked what he will do next, the man tentatively returns to the ambition established earlier: *Frisco*: "I might drive across the United States"; *The Holdovers*: "Maybe I'll start in Carthage."

16. Between those bookends, the similarities become still more particular. Failed efforts to reach or obtain help from the teenager's mother figure leave the pair together. The next day, the sixth story day of both works, a hotel-booking exchange encounters the same obstacle—a single room is unavailable—then turns to a suite, with the teenager offering to pay. The teenager then rejects the man's authority in an argument that runs through the same steps in both works, and a medical emergency forces him to exercise that rejected authority. On that same story day, at a check-in—before the emergency in *Frisco*, afterward in *The Holdovers*—the teenager takes over, invents a marriage or former marriage between the man and the teenager's mother figure, and ends the scene calling the man "Dad," leaving him no opportunity to refuse the role. The emergency proves manageable, the teenager is discharged that evening making woozy demands of the man, and the man ends the day with a large whisky. Nothing in either premise requires those events to share a

day, and *Merlusse* contains none of them.

17. Later, at the end of a celebratory meal, the teenager lists the sights or activities she or he wants to experience, in the matched anaphora described above; the man refuses—*Frisco*: "It's too late now"; *The Holdovers*: "It's out of the question"—the woman intervenes, and the man relents. During the ensuing outing, the pair visit a place associated with their shared intellectual interest, where enthusiasm meets deflation and gives way to personal barbs. On the last night in the city, an alcohol-related episode likewise develops through corresponding exchanges: a proposed food or drink with a memorable name "Jaegerbomb" or "Cherries Jubilee," a question about it, an answer omitting its alcohol content, an approving response, the man's order of the item for the minor, a staff member's refusal to serve it that ends with the group leaving, the man's disapproval softening, and an image of the group together in the dark, gazing at a light. Back home, the man who begins by policing the teenager's conduct ends by joining in the rule-breaking and standing up to the adults he once accommodated. The supposed caretaker has learned from his charge how to reclaim his own life.

18. These correspondences extend across every category of expression the Ninth Circuit examines in assessing substantial similarity: plot, themes, dialogue, mood, setting, pace, characters, and sequence of events. The character parallels reach beyond the central pair to the adult confidante, the unrequited love, the exasperated supervisor, and even the unseen politician whose complaint threatens the man's job. Their encounters develop the same central theme: a neglected teenager's vitality challenges a weary adult's surrender to disappointment. The comedy unfolds under the shadow of a young person's death, and the man's eventual renewal gives each ending its bittersweet force.

19. Defendants took *Frisco*'s protected expression: its scenes, their internal construction, and the particular exchanges and dramatic details that give them life. They also took *Frisco*'s selection and arrangement of those elements, characters and

devices, in the same order and on the same story days, which is protected even where a single element, on its own, would not be. *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002). Changing names, professions, and locations did not make Stephenson's writing Defendants' own.

20. Nearly a century ago, *Sheldon v. Metro-Goldwyn Pictures Corp*. addressed a similar course of conduct: Defendants failed to acquire the rights to a play and then carried its dramatic sequences into a film they claimed was drawn from a different source. 81 F.2d 49, 50–56 (2d Cir. 1936). The film renamed its characters, opened in a different city, and moved incidents from one scene to another. Judge Learned Hand nonetheless found infringement due to the "parallelism of incident" across three scenes. Of one scene, he wrote: "Surely the sequence of these details is pro tanto the very web of the authors' dramatic expression; and copying them is not 'fair use.'" Nor did it matter that the film also drew on other sources: "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Id.* at 56.

21. *The Holdovers* grossed more than $48 million in worldwide box office, before bringing in many tens of millions more in downstream distribution.[4] Its screenplay won the Writers Guild Award for Original Screenplay and received Academy Award and BAFTA nominations in that category. Hemingson received the credit and the accolades. Stephenson received nothing. He brings this action to recover for the unauthorized use of his work and Defendants' profits from it.

## **PARTIES**

22. Plaintiff Simon Stephenson is an individual residing in Los Angeles, California. Stephenson is an established screenwriter and author whose credits on

[4] Box Office Mojo, *The Holdovers* (2023), https://www.boxofficemojo.com/title/tt14849194/?ref_=bo_se_r_1 ($48,613,483 worldwide).

films include Pixar's *Luca*, *Paddington 2*, and *The Electrical Life of Louis Wain*. Stephenson is the author and copyright owner of the original feature-length screenplay *Frisco*, the copyrighted work at issue in this action.

23. Defendant Alexander Payne is an individual residing in Omaha, Nebraska, but spends a considerable amount of time in Los Angeles, California, including during the time period at issue in this Complaint. Upon information and belief, Payne owns a home in Topanga Canyon, California. Payne is a filmmaker, screenwriter, producer, and director whose credits include *Election*, *About Schmidt*, *Sideways*, *The Descendants*, *Nebraska*, and *The Holdovers*. Payne directed *The Holdovers* and participated in the Film's development and production.

24. Defendant David Hemingson is an individual residing in Los Angeles, California. Hemingson is a television writer and producer who, before *The Holdovers*, had never had a feature screenplay produced. He received sole screenwriting credit for the Film.

25. Defendant Mark Johnson is an individual residing in Los Angeles, California. Johnson is a motion-picture producer and was a producer of *The Holdovers*. Johnson reviewed and provided input on drafts of *The Holdovers* screenplay during its development, received drafts before principal photography, and participated in the Film's development and production.

26. Plaintiff is informed and believes and on that basis alleges that Defendant Gran Via Productions LLC ("Gran Via") is a limited liability company organized under the laws of California, with its principal place of business in Los Angeles, California. Gran Via is Johnson's production company. On information and belief, Johnson acted through Gran Via in developing and producing *The Holdovers*, and Gran Via received, reproduced, and distributed drafts of the screenplay.

27. Plaintiff is informed and believes and on that basis alleges that Defendant Honest Scholar Productions, LLC ("Honest Scholar") is a limited

liability company organized under the laws of Delaware, with its principal place of business in Los Angeles, California. On information and belief, Honest Scholar was the production entity for *The Holdovers*. Copyright Office records identify Nobrose Development, LLC as the claimant on the January 2022 registration for *The Holdovers* screenplay and reflect a subsequent recorded transaction concerning *The Holdovers* from Nobrose to Honest Scholar in December 2022. The records further reflect a subsequent transaction from Honest Scholar to Miramax Distribution Services, LLC.

28. Plaintiff is informed and believes and on that basis alleges that Defendant Miramax Distribution Services, LLC ("Miramax") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Los Angeles, California.

29. Plaintiff is informed and believes and on that basis alleges that Defendant Miramax, LLC ("Miramax Parent") is a limited liability company organized under the laws of the State of California, with its principal place of business in Los Angeles, California. Miramax and Miramax Parent financed and produced *The Holdovers*.

30. Plaintiff is informed and believes and on that basis alleges that Defendant Focus Features LLC ("Focus") is a limited liability company organized under the laws of Delaware, with its principal place of business in Universal City, California, and regularly conducts significant ongoing business in Los Angeles, California. Plaintiff is further informed and believes and on that basis alleges that Focus distributed the motion picture *The Holdovers* (the "Film") for theatrical exhibition in the United States.

31. Plaintiff is informed and believes and on that basis alleges that Defendant Universal Pictures Home Entertainment LLC ("UPHE") is a limited liability company organized under the laws of Delaware, with its principal place of business in Universal City, California, and regularly conducts significant ongoing

business in Los Angeles, California. Plaintiff is further informed and believes and on that basis alleges that UPHE distributed the Film for home entertainment in the United States, including through digital releases and the sale of Blu-ray and DVD editions.

32. Plaintiff is informed and believes and on that basis alleges that Defendant NBCUniversal Media, LLC ("NBCUniversal") is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York, and regularly conducts significant ongoing business in the State of California and in the County of Los Angeles. Plaintiff is further informed and believes and on that basis alleges that NBCUniversal operates the Universal Filmed Entertainment Group ("UFEG") as a division, and acting through UFEG, participated in arranging and licensing the Film for streaming exhibition.

33. The true names and capacities, whether individual, corporate, or otherwise, of the Defendants named herein as DOES 1 through 10, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 through 10, inclusive, when Plaintiff has ascertained such information. Plaintiff is informed and believes, and on that basis alleges, that each Defendant named herein as DOES 1 through 10, inclusive, has participated in some or all of the acts or conduct alleged in this Complaint and is liable to Plaintiff by reason thereof.

34. Plaintiff is informed and believes, and on that basis alleges, that each Defendant participated in, authorized, controlled, benefited from, or otherwise contributed to the creation, production, reproduction, distribution, licensing, promotion, or exploitation of *The Holdovers*.

**JURISDICTION AND VENUE**

35. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, including 17 U.S.C.

§§ 106, 501, 1202, and 1203.

36. Defendants engaged in acts in California relating to the acquisition, development, production, distribution, or licensing at issue in this action. Plaintiff's claims arise out of or relate to those acts. The California-based Defendants also reside or maintain their principal places of business in California as alleged above.

37. Venue is proper under 28 U.S.C. § 1400(a) as to the copyright claims because Defendants reside or may be found in this District, and under 28 U.S.C. § 1391(b)(2) as to the related claims because a substantial part of the events giving rise to those claims occurred in this District.

## FACTUAL BACKGROUND

### A. Stephenson's Creation and Ownership of *Frisco*.

38. Before writing *Frisco*, Stephenson was a pediatrician. Drawing in part on that experience, he wrote *Frisco* in 2012-2013.

39. By January 2013, Stephenson had completed a second draft of the script.

40. When *Frisco* began to circulate in Hollywood in August 2013, senior figures at major talent agencies, management companies and studios wrote to Stephenson and his representatives to praise it. Later that year, thirty-nine film executives voted *Frisco* third on the annual Black List, the industry's ranking of its most highly regarded unproduced screenplays.

41. At all relevant times, recipients of *Frisco* understood that the screenplay was being circulated for commercial purposes and that Stephenson expected compensation if the screenplay or its protected content were used. Neither its circulation nor its recognition gave Defendants permission to take its protected expression for another film. Stephenson never authorized Defendants to reproduce, adapt, distribute, publicly perform, or otherwise exploit *Frisco* or a derivative work based on it.

42. On March 4, 2024, the United States Copyright Office registered the

first draft of *Frisco* as an unpublished dramatic work under Registration No. PAU004214821, identifying Stephenson as the work's author and copyright claimant and 2012 as its year of creation. On September 25, 2026, the United States Copyright Office additionally registered the changes made in the 2013 draft as Registration No. TXu 2-566-622, identifying Stephenson as the work's author and copyright claimant and 2013 as its year of creation.[5]

**B. Payne Received and Praised *Frisco* Years Before Developing *The Holdovers*.**

43. In 2013, Stephenson and his representatives sought to bring *Frisco* to the screen with Payne as its director or producer. On August 28, 2013, Verve (a prominent talent and literary agency based in Los Angeles) agent Bryan Besser emailed Stephenson and others: "We gave FRISCO to Alexander Payne's producing partner Jim Burke whom we took to lunch yesterday."[6] The screenplay submitted was the January 20, 2013 draft ("2013 Draft"). Its title page identified *Frisco* and its author, Simon Stephenson.

44. The submission reached its intended reader. On January 6, 2014, Stephenson's agent, Geoff Morley of United Talent Agency ("UTA"), reported that he had spoken about *Frisco* directly with Burke (Payne's producing partner) who had informed him that "Payne did like it but was not interested in prod or directing it."[7]

45. Separately, on October 24, 2013, Tom McNulty, a producer who had been attached to help get *Frisco* into production, reported a conversation with Payne's agent at CAA, Craig Gering. Describing the director's decision to pass on

---

[5] This second registration was made to ensure the copyright extended to all the material at issue.

[6] (Besser email of Aug. 28, 2013 at Exhibit B.)

[7] (Morley email of Jan. 6, 2014 at Exhibit C.)

the project, McNulty relayed Gering's message that Payne—and another of Gering's director clients—had "both loved the writing."[8]

46. Through two of Payne's representatives—his agent and his producing partner—Payne thus communicated a response to the *Frisco* screenplay he had read. Neither the submission nor Payne's receipt of it authorized Payne to adapt its protected expression into a different film.

### C. Paul Giamatti Receives a Copy of *Frisco*.

47. In 2016, Stephenson's agents at UTA submitted *Frisco* to another UTA client, actor Paul Giamatti. The hope was that Giamatti would play the lead role of Jeff Willis in *Frisco*. Stephenson's agent reported that Giamatti "likes this a lot, as do his reps," though he had "a couple of things competing for the hiatus slot."[9] Giamatti went on to play the lead role in *The Holdovers*.

48. Plaintiff does not allege that Giamatti participated in any copying. Giamatti's serious interest in the role of Willis is highlighted as further evidence of both the quality and value of the *Frisco* screenplay and the similarity between the two roles.

### D. Payne Receives *Frisco* Again While Developing *The Holdovers*.

49. In late 2019, Payne received *Frisco* a second time, through an entirely separate professional channel. Producer John Woodward obtained Stephenson's permission to submit the project to Payne on behalf of Netflix, after another Payne project at Netflix had fallen through.

50. As with the 2013 Draft sent to Payne, the draft of *Frisco* submitted to him in 2019 (the "2019 Draft") also identified its title, *Frisco*, and Simon Stephenson as its author. Again, Stephenson did not authorize any person to remove, alter, replace, or conceal that identifying information.

---

[8] (McNulty email of Oct. 24, 2013 at Exhibit A.)

[9] (Thuan email of Nov. 3, 2016 at Exhibit D.)

51. Following the 2019 Draft submission, Woodward informed Plaintiff that "Alexander [Payne] has now read but says it is not quite what he is looking for."[10]

52. The 2019 Draft was materially identical to the 2013 Draft Payne had received. It added a short title sequence; it made Willis "in his mid to late fifties" rather than "in his late forties or early fifties," with matching edits to the jokes about his age in the longboard scene; and it made minor spelling and wording changes. Every scene, every speech and the order of events are otherwise unchanged.

53. Because the two drafts are materially identical, the *Frisco* material in the drafts of *The Holdovers* could have been taken from either one.

**E. The Drafts of *The Holdovers* Came Through Payne.**

54. Plaintiff is in possession of three drafts of *The Holdovers*: one dated May 6, 2021 (the "May Draft"); one dated September 16, 2021 (the "September Draft"); and the screenplay Defendants released publicly for the 2023 awards campaign (the "Awards Draft").[11]

**1. Payne's Role In Drafting *The Holdovers*.**

55. David Hemingson is the credited screenwriter of *The Holdovers*. Nonetheless, by Defendants' own admission, the film's director, Alexander Payne, conceived the film, chose its story, directed its structure, and rewrote Hemingson's pages.

56. Hemingson has repeatedly dated Payne's first, unsolicited approach to him to approximately August 2018, some five years after Payne first received

[10] (Woodward email of Dec. 6, 2019 at Exhibit E.)

[11] Citations to "Fr." are to the Second Draft of *Frisco*, dated January 20, 2013; to "May," "Sept." and "Aw." to the May, September and Awards Drafts of *The Holdovers*; to "Film" to timecodes in the Film. References to "Beats" are to the twenty-four beats set out in the Substantial Similarity section.

*Frisco*.[12]

57. Payne has a writing credit on all but one of his seven other feature films, and has won two Academy Awards in the Best Adapted Screenplay category. *The Holdovers* is Hemingson's first produced feature film.

58. Payne concedes that he supplied the premise for *The Holdovers*: "I called up the writer David Hemingson and said . . . would you consider writing a feature script for me based on an idea I'm going to give you?"[13]

59. Hemingson's own first version of *The Holdovers*, "*Five Porcelain Fingers*," was very different from *Frisco* and the 2021 drafts of *The Holdovers*. It centered on the relationship between a teacher and his former girlfriend, who had lost her hand in a car crash. Per Hemingson, Payne "was like, 'this is not the movie.'"[14] Payne's note, as Hemingson reports it, was "I'm more interested in the kid."[15]

60. Payne suggested the road trip the characters take: "he [Payne] literally said like, hey, would it be fun if they went on the road?"[16]

[12] David Hemingson, The Screenwriting Life podcast, episode 178, at 27:34, Feb. 8, 2024, https://talkhouse.com/178-the-holdovers-writer-david-hemingson-on-finding-humanity-in-our-characters ("Screenwriting Life"); David Hemingson, Conversations with the Artist, late 2023, https://www.youtube.com/watch?v=wFjf1ytpjhA ("Conversations with the Artist").

[13] Alexander Payne, interview, AwardsWatch, Nov. 10, 2023 https://awardswatch.com/interview-alexander-payne-on-creating-the-holdovers-and-making-it-good-til-the-last-drop/.

[14] David Hemingson, Script Apart podcast, episode 91, Feb. 1, 2024, https://www.scriptapart.com/episodes/episode-91-the-holdovers-david-hemingson-interview ("Script Apart").

[15] David Hemingson, Write On podcast, Nov. 10, 2023, https://blog.finaldraft.com/write-on-the-holdovers-writer-david-hemingson.

[16] Script Apart.

61. Payne likewise concedes that he prompted the female third character, who has no analogue in *Merlusse*, the film Payne claims as his model: "I just asked David, 'Who cooks for the boys who are holding over?'"[17]

62. Payne also concedes he "put some classical jokes in there."[18] *The Holdovers*' classical material occurs at the same points as *Frisco*'s Beat Generation material and plays the same role in the narrative, as discussed below.

63. Payne gave Hemingson notes act-by-act as the writing was in progress. As Hemingson describes it: "that collaboration was pretty much I'd send him [Payne] an act at a time and he'd have thoughts."[19]

64. Payne also enlisted producer Mark Johnson to provide input on early drafts. Hemingson has described resolving a disputed story point at the end of Act 1 "with the help of Mark Johnson."[20]

65. By his own admission, Payne rewrote portions of the screenplay: "He [Hemingson] would write portions of the screenplay, show them to me, you know … just a big back and forth. I would rewrite parts and send them back to him and we wound up with a screenplay that we were both happy with."[21]

66. Payne continued writing after Hemingson had completed a script: "He [Hemingson] wrote a script and came up with a bunch of stuff that I never would

---

[17] Alexander Payne, The Hollywood Reporter, Jan. 16, 2024, https://www.hollywoodreporter.com/movies/movie-features/making-of-the-holdovers-paul-giamatti-1235788162/.

[18] Alexander Payne, in conversation with Ann Hornaday, Nov. 11, 2023, https://www.youtube.com/watch?v=StMx3gWmtcI.

[19] David Hemingson, interview, at 10:30–10:35, Dec. 2023, https://www.youtube.com/watch?v=kAMVD6gdFSw.

[20] Screenwriting Life, at 48:00.

[21] Alexander Payne, interview, The Riverside Woodbridge, at 03:36–03:51, Feb. 8, 2024, https://www.youtube.com/watch?v=0eNMJlujE_c ("Riverside").

have thought of. Then I had to get under the hood a little bit and make it more personal to me."[22]

**2. The Files Are Typed in Payne's Style.**

67. Writers leave stylistic traces, and those traces can show who prepared a document.

68. The two men's styles were established from their publicly available screenplays. For Hemingson, two television pilots, *Whiskey Cavalier* (3rd Network Draft, 2018) and *Snap* (2019).[23] For Payne, *Downsizing* (2017), *Sideways* (2004)[24] and *The Descendants* (2011). Payne wrote *Downsizing* and *Sideways* with his usual co-writer, Jim Taylor. He shares credit on *The Descendants* with Nat Faxon and Jim

---

[22] Alexander Payne, The Rough Cut, Frame.io, Nov. 9, 2023, https://blog.frame.io/2023/11/09/the-rough-cut-finding-discomfort-and-joy-in-the-holdovers/ ("Rough Cut").

[23] Hemingson's pilots are his only publicly available scripts: David Hemingson, *Whiskey Cavalier* (pilot), 3rd Network Draft (Jan. 12, 2018), Script Slug, https://assets.scriptslug.com/live/pdf/scripts/whiskey-cavalier-101-pilot-2019.pdf (downloaded Oct. 25, 2026); David Hemingson, *Snap* (pilot), FOX 2nd Draft (Dec. 30, 2019), TV Writing, http://tvwriting.co.uk/tv_scripts/2020/Drama/Snap_1x01_-_Pilot.pdf (downloaded Mar. 18, 2025). They agree with each other on every marker, across two networks and a year, and with the habits in the text Hemingson stated he wrote in the Awards Draft.

[24] Alexander Payne & Jim Taylor, *Downsizing* (Production Final, Nov. 21, 2017), The Daily Script, https://www.dailyscript.com/scripts/downsizing.pdf (downloaded July 10, 2025); Alexander Payne, Nat Faxon & Jim Rash, *The Descendants* (screenplay, © 2010 Willow and Oak, Inc.), Final Draft export of Nov. 2, 2011 (PDF metadata listing the author as Alexander Payne), archived from nycscreenwriter.org, https://web.archive.org/web/20121224155054/http://nycscreenwriter.org:80/uploads/Descendents.pdf (captured Dec. 24, 2012; retrieved Oct. 25, 2026); Alexander Payne & Jim Taylor, *Sideways* (May 29, 2003), scan of the shooting script (143 pp.)); a native-text file of a different version, https://www.writingclasses.com/WritingMovies/Sideways.pdf, gives the same "UNDER BLACK" and dash results. Neither copy's spacing is relied on.

Rash but has said he "started from scratch" rather than revising their draft.[25]

69. *The Holdovers* is structured by story-day cards (e.g., "DAY 1 - DECEMBER 18, 1970"). The May Draft has ten, every one introduced with the words "UNDER BLACK." The September Draft adds an eleventh, introduced the same way. In the Awards Draft, eight of nine remain; the Christmas Day card lost its introducer when the scene before it was rewritten.[26] (May 1–106; Sept. 1–101; Aw. 1–96.)

70. In screenwriting, text or sound presented on a black screen is introduced "OVER BLACK": the words appear over the black.[27] "UNDER BLACK" reverses the sense of the term. A term used incorrectly, and consistently, is more telling than a preference: it is a habit particular to a writer, not a choice any writer might make.

71. Hemingson has said the day cards in *The Holdovers* were his: "fewer of them in the movie than I wrote into the screenplay."[28] But "UNDER BLACK" appears in neither of his pilots. Where they put text on screen, the scripts use "TITLE CARD:" and, in *Snap*, the correct "OVER BLACK:".

72. Where "UNDER BLACK" does appear is in the screenplays of Payne

---

[25] Anne Thompson, *Alexander Payne Talks The Descendants, Clooney, Next Black and White Film, New Trailer*, IndieWire (Oct. 18, 2011), https://www.indiewire.com/features/general/alexander-payne-talks-the-descendants-clooney-next-black-and-white-film-new-trailer-184397 ("when I decided to do it, I didn't overhaul it—I started from scratch. I did my own").

[26] The Christmas Day card: May 74, Sept. 70, Aw. 68; the Awards Draft line leading into it is single-spaced. The Day 9 card in the 2021 drafts is typed "UNDER BLACK--", without the space every other card has (May 79; Sept. 75); the Awards Draft removes it.

[27] *See* Karel Segers, *Formatting Tip: Audio Over Black and Text Over Image*, The Story Department, https://thestorydepartment.com/formatting-tip-audio-over-black-and-text-over-image.

[28] WGF, at 0:27:58.

and Taylor. *Sideways* is built, like *The Holdovers*, on a run of day cards, and six of its eight are introduced with “UNDER BLACK”; a seventh “UNDER BLACK” introduces a sound. *Downsizing* uses “UNDER BLACK --” twice, for sounds. The inference here is easy: the “UNDER BLACK” formulation in *The Holdovers* is from Payne.

73. At a more granular level, the two men have consistently different typing habits. Hemingson puts one space after a period; writes a dash inside a sentence as a single hyphen, using a double hyphen only where a line is cut off, and then closed up to the word; and marks pauses with the word “beat.” Payne does the opposite on each: two spaces, the double hyphen, a space before the double hyphen where a line is cut off, and never “beat.”

74. With the “UNDER BLACK” error and the software each file was exported from (Section E.4), that makes six independent markers, each measurable in the public screenplays of both men. The drafts of *The Holdovers* fall on Payne’s side of every one:[29]

[29] Measured from the character positions in each PDF by a documented, reproducible method, which Plaintiff will produce. A gap at a line end is not counted; the May and September Drafts’ identical totals (955) are a coincidence of revision, 342 gaps removed and 342 added. By script: *Whiskey Cavalier* 669 of 674 one-space, *Snap* 442 of 443; *Downsizing* 1,107 of 1,118 two-space, *The Descendants* 1,085 of 1,092. The cut-off figures combine double hyphens at the end of a line and at the start of the next; the one single hyphen in Payne’s scripts is a date range in *The Descendants*, and a line in *Downsizing* consisting of the dashes alone is not counted. “UNDER BLACK” in *Sideways* introduces six cards and one sound, in *Downsizing* two sounds; the pilots use “TITLE CARD:” and, in *Snap*, “OVER BLACK:”. The Awards Draft’s three “beat” pauses are at Aw. 41, 62 and 101. Dialogue parentheticals that mark a pause are too few in the drafts to serve as a marker and are not relied on: Payne writes “(then --)” and never a bare “(then)”; Hemingson writes “(a beat, then)” or a bare “(then)” and never “(then --)”; the May Draft has one “(then)” (May 54), the September Draft one “(then --)” (Sept. 95), the Awards Draft one of each form (Aw. 62, 88), all in text new to the draft in which they appear.

| Marker | Hemingson | Payne | May | September | Awards | Match |
|---|---|---|---|---|---|---|
| Spaces after a period | one: 1,111 of 1,117 (99.5%) | two: 2,192 of 2,210 (99.2%) | two: 948 of 955 (99.3%) | two: 943 of 955 (98.7%) | two: 900 of 941 (95.6%) | **Payne** |
| Dash inside a sentence | single (70 of 70) | double (209 of 209) | double (49 of 51) | double (56 of 57) | double (53 of 58) | **Payne** |
| Double hyphen where a line is cut off | closed up (70 of 70) | spaced (135 of 135) | spaced (41 of 44) | spaced (47 of 49) | spaced (33 of 35) | **Payne** |
| "Beat" as a pause | 38 | 0 | 0 | 0 | 3 (new text only) | **Payne** |
| Text on a black screen | OVER BLACK | UNDER BLACK (9) | UNDER BLACK (10 of 10) | UNDER BLACK (11 of 11) | UNDER BLACK (8 of 9) | **Payne** |
| Export software (Final Draft) | FD 9 | FD 10 | FD 10 | FD 10 | FD 12 | **Payne (2021)** |

75. The May and September Drafts – on which, on information and belief, the Film's financing was agreed and pre-production began – follow Payne's habits on every marker. The Awards Draft, released for the 2023 campaign, still follows them on the first five; Hemingson's habits appear only in text added for that draft. (The sixth marker is the particular software version and, unlike the 2021 drafts, the version used for the Awards Draft is not known to be used by either Payne or Hemingson.)

76. The habits are stable within each writer. Hemingson's two pilots, written a year apart for different networks, agree with each other on every marker; Payne's two measured scripts, written years apart, one with Taylor and one alone, agree with each other on every textual marker, and his Downsizing was exported to PDF using the same version of Final Draft that exported The Holdovers.

77. What the public files cannot show is the machine on which the drafts

were typed. The native .fdx files can, and they are in Defendants' possession (Section E.4). Plaintiff pleads these measurements as facts, reproducible by anyone from the public files, and will seek the native files in discovery to confirm whose hand they record.

78. The revision history shows the same thing. Through the September Draft, single-spaced sentence gaps appear only in text new to that draft: none of the 489 gaps in text carried unchanged from the May Draft is single-spaced, against 7 of 79 in new text. In the Awards Draft, they appear in new text (19 of 159) and, in ten places, between older sentences whose spacing that draft changed; each of those ten was two spaces in the September Draft, and each sits in a scene the Awards Draft otherwise revised. Most of the later text is still double-spaced, consistent with Payne's own account that he kept rewriting after Hemingson had a complete script.

79. Every passage Hemingson has claimed as his own gives the same answer: in the 2021 drafts, each is typed in Payne's style (the check-in, 10 of 10 gaps two-space; the box scene, 6 of 6 in May and 5 of 5 in September; the opening pages, 255 of 257), and his own habit appears in them only in the Awards Draft's revisions.

80. The clearest example is the near-wordless scene in which Mary (the cook) unpacks a box of her late son's baby things, which Hemingson has called "incredibly hard to write" and "[r]ewritten the most,"[30] and which has no counterpart in *Frisco*. In the Awards Draft, every sentence gap in the rewritten middle passage is single-spaced (4 of 4), while every gap in the sentences carried over from the 2021 drafts on either side keeps two spaces (4 of 4). (May 96; Sept. 90; Aw. 75.)

81. In other words, all the drafts were typed in Payne's style, not

[30] David Hemingson, Writers Guild Foundation, Script Breakdown webinar, at 1:09:47, Jan. 22, 2024, https://www.youtube.com/watch?v=ff5VoVLWtac ("WGF").

Hemingson's, and in the 2021 drafts, not one marker points to Hemingson.

**3. The First Thirty Pages.**

82. Hemingson has said that "within two days, I had the first 30 pages of the screenplay" and that the beginning "really hasn't changed at all since I wrote it."[31] The drafts contradict him twice. In the May Draft, those pages are typed in Payne's style: 255 of their 257 sentence gaps are two-spaced, all 18 of their mid-line dashes are double hyphens, they never mark a pause with "beat," and both their day cards carry the "UNDER BLACK" error. (May 1–30.) And they did change: several *Frisco*-derived elements in the May Draft's opening pages are gone from the Awards Draft (Section F.2(C)).

83. Those thirty pages, typed in Payne's style, contain Beats 1 through 3 – the opening montage, the summons with its "Tell him" deferral and "He says now," and the first boss meeting in fifteen matched beats, with the unseen politician parent, the warning and the isolation in the dining hall (Exhibit G at Table 17 (pp. 5-8).); the teenager introduced at fifteen, cursing an unseen step-parent and accused of stealing from another boy; the mother's call that leaves him in the man's charge; the infirmary; Mary's three friendship beats with Paul, in the order of Valerie's with Willis; and, on page 30, the Day 4 card at which the two works fall into step by story day.

84. Payne's longtime editor, Kevin Tent, puts those pages in Payne's hands: "I think he [Payne] gave me the first 30 pages and he wanted to know what I thought of that. He was trying to figure out what he wanted to do next."[32] Elsewhere Tent put the pages at "about 45 pages… up to when the boys leave."[33] On a podcast

---

[31] Script Apart, at 0:30:58; WGF, at 0:23:46.

[32] Kevin Tent, Moviefone, Jan. 25, 2024, https://www.moviefone.com/news/the-holdovers-interview-alexander-payne-and-kevin-tent/.

[33] Kevin Tent, The Credits, Feb. 23, 2024, https://www.motionpictures.org/2024/02/the-holdovers-oscar-nominated-edtior-

with Payne, Tent said: "I think you had around forty-five pages written, right?" Payne: "Could be. David was sharing portions of drafts with me during the process." Tent: "I remember reading forty-five pages and thinking, 'This seems great.' … You usually send me the script when you're thinking seriously about something."[34]

85. On information and belief, Payne prepared or substantially revised the drafts of *The Holdovers*.

**4. The 2021 Files Were Exported with Software Hemingson Did Not Use.**

86. Final Draft saves a screenplay as an editable working file (".fdx") and exports PDFs from it. The working file holds what a PDF does not: author information, revision history, notes, and stored lists of the character names and locations used. A PDF does, however, keep two things in its metadata that people often do not realize it keeps: the name of the program that created it, and the name of the file it was exported from.

87. The May and September Drafts were both exported from Final Draft 10. So was Payne and Taylor's *Downsizing*. (*See* paragraph 90, infra, for metadata showing use of Final Draft 10 for the May 2021 Draft.)

88. Hemingson's two pilots, *Whiskey Cavalier* (2018) and *Snap* (2019), were both exported from Final Draft 9. Final Draft sells only its current version,[35] and Final Draft 11 replaced Final Draft 10 on September 5, 2018. A writer still on

---

kevin-tent-on-creating-a-70s-vibe-with-timeless-performances/ ("The Credits").

[34] Rough Cut.

[35] Final Draft, *Can I purchase an older version of Final Draft?*, Final Draft Help Center, https://kb.finaldraft.com/hc/en-us/articles/15573790967572-Can-I-purchase-an-older-version-of-Final-Draft ("the only version available for purchase is" the current release); Final Draft, *Which version of Final Draft can I run on which operating system?*, https://kb.finaldraft.com/hc/en-us/articles/15575353614996 (Final Draft 10 released Q3 2016; 11, Q3 2018; 12, Q2 2021).

Final Draft 9 in late 2019, as Hemingson was, could not then have bought Final Draft 10. The Awards Draft, released in 2023, was exported from Final Draft 12.

89. Plaintiff is informed and believes, and on that basis alleges, that the 2021 drafts were exported on a machine other than the one Hemingson used for his own scripts. The native .fdx files, which would show on whose machine the drafts were written, are peculiarly within Defendants' possession and control.

**5. The May 2021 File Was Prepared "for Jim."**

90. The May Draft's metadata shows it was exported from a Final Draft (.fdx) file titled "HOLDOVERS FOR JIM."




91. A screenplay sent for a read and opinion is ordinarily sent as a PDF, not as an .fdx, and exporting a PDF does not require renaming the underlying file.

92. The May Draft contains a section of bolded text covering the boys' move into the school's infirmary (May 22–25). By the September Draft the bolding is gone and the material has been split into two scenes and polished. In both drafts the passages are typed in Payne's style, not Hemingson's.

93. In other words, the editable working file was named for someone called

Jim. Payne has at least two close associates named Jim: his regular co-writer Jim Taylor and his producing partner Jim Burke, who received *Frisco* in 2013. Neither had any crediting role in *The Holdovers*. Who "Jim" is lies peculiarly within Defendants' knowledge. On information and belief, it was prepared for someone other than Hemingson to work on, and the bolded section, rewritten by the September Draft, marked the material he was to revise.

94. Plaintiff is informed and believes, and on that basis alleges, that Payne used *Frisco* in developing *The Holdovers*, and either supervised the incorporation of *Frisco* material by Hemingson or others, or incorporated it himself.

**F. Drafts of *The Holdovers* Contain Residue from *Frisco*.**

95. Beyond their own stylistic traces, a writer who transposes an existing script may leave behind traces of the original work. Copying may be proved by similarities that are probative of copying; such similarities need not be extensive and need not involve protected expression, so long as they are ones that would not be expected had the two works been created independently. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). Details carried over from a source and left without purpose in the copy are such similarities. The three drafts of *The Holdovers* show (1) elements of *Frisco* that the finished screenplay retains without the story that explains them; (2) surface traces of *Frisco* being removed; and (3) ongoing revisions that added further substantive *Frisco* elements. Attached as Exhibit F is an appendix charting the traces of *Frisco* through the three available drafts of *The Holdovers*.

**1. The "Medical Conference"**

96. A recognizable element of an original work, left orphaned in a copied work, is known as a "vestigial element." *The Holdovers* contains a striking one.

97. In the May Draft, Angus, while attempting to reserve a hotel room, falsely tells the hotel employee: "Well if you don't have a single room, I'll take a junior suite. I understand it's the holidays, but it's kind of an emergency. I'm

coming into the city for a medical conference." (May 40.) The "medical conference" reference appears in the dialogue without explanation and is never mentioned elsewhere in the screenplay. Neither Angus nor any other character attends a medical conference, discusses a medical conference, or travels to Boston for that purpose. (*See* Exhibit F at Table 1 (p. 1).)

```
Angus talks on a PAY PHONE.                                40.

                          ANGUS
            Well if you don't have a single
            room, I'll take a junior suite.  I
            understand it's the holidays, but
            it's kind of an emergency.  I'm
            coming into the city for a medical
            conference.
```

98. The medical-conference reference in *The Holdovers* is remarkable because *Frisco* centers on a pediatrician traveling to San Francisco to attend and speak ***at a medical conference***, and that conference provides the reason for the trip that drives the screenplay's central events. It also explains the hotel booking: Willis and Amy find no single rooms left because of the conference, and take a named suite. (Fr. 50–51.) Angus's call follows the same steps, with the holidays standing in for the conference as the reason the hotel is full.

99. While subsequent drafts of *The Holdovers* delete the "medical conference" language from Angus's call, the surrounding structure of the hotel-booking sequence remains substantially unchanged. In the September and Awards Drafts, Angus still asks for a single room, describes the situation as "kind of an emergency," and requests a junior suite; only the medical conference is gone. (Sept. 39; Aw. 39; *see* Exhibit F at Table 2 (p. 2).)

100. Of all the excuses the screenplay could have given Angus, it gave him *Frisco*'s premise, at the same moment in the story. The inclusion of a stray "medical conference" reference in an otherwise unrelated screenplay, followed by its removal

while the surrounding dialogue and sequence remain substantially intact, supports the inference that material derived from *Frisco* was incorporated into an early draft of *The Holdovers* and later revised.

101. The drafts contain other medical elements that are collectively unusual in a story about a teacher and his pupils. *The Holdovers* pupils are moved into the school infirmary, so that Angus, like Amy at the same point, lives in a sickroom. (Aw. 17, 28.) In the May Draft, shortly after the move, one of the boys opens the medicine cabinet and asks, "What's paracetamol?" That is the name used outside the United States for acetaminophen, sold in the United States as Tylenol, which Amy is herself revealed to be taking at the corresponding point in *Frisco*, in a scene set in her own hospital room. The exchange does little in the story and is gone by the September Draft. (May 26–28; Fr. 31.) The finished screenplay also styles both the headmaster and his predecessor "Dr.," and ends the parents' climactic meeting—where *Frisco* ends its own with Willis insulting his boss by suggesting that the parents' herbal-vaccinating friend Jenna take over allergy—on an insult to his boss that is unaccountably medical: "penis cancer in human form." (Aw. 102; Fr. 25, 115.) Both those devices are pleaded with their *Frisco* counterparts under Dialogue.

**2. Details of *Frisco* Removed in Revisions of *The Holdovers*.**

102. Additional recognizable surface details of *Frisco* present in the 2021 drafts are removed in later drafts. They include the following.

(A) <u>A scene heading for a move that does not happen.</u>

103. The sequence in which Angus makes a call carries a second trace of *Frisco*. In both screenplays, Willis/Paul catches the teenager breaking a rule tied to a hotel, and the two argue over his authority. As set out in the Substantial Similarity section, the two arguments move through the same exchanges in the same order. (Beat 7.)

104. By screenwriting convention, a scene heading marks a change of place or time. In *Frisco*, the caretaking argument breaks after Willis's last word on

punishment ("I'd probably let you walk all over me like my actual daughters do"). The scene then cuts from the bookstore to "INT. CAB - NIGHT," where the argument picks up again. In the May and September Drafts of *The Holdovers*, the heading "INT. HALLWAY - CONTINUOUS" appears at the same point, right after Paul's last word on punishment ("That's another detention!").

105. At that point in *The Holdovers*, however, the action neither leaves the hallway nor moves forward in time, so no new scene heading is required, and the unexplained "INT. HALLWAY – CONTINUOUS" heading is gone from the Awards Draft. (Fr. 60; May 41; Sept. 40; Aw. 39–40; Exhibit F at Table 3 (p. 3).)

106. The scene heading also falls at the same turn in the argument. In each work, the argument resumes after the break and escalates from an empty threat to a real punishment. After the cut to the cab, Willis takes away the dinner out Amy was promised ("We'll eat at the hotel") and, when she protests, tells her she "should have thought about that before you broke curfew." After the redundant heading, Paul moves to "Second detention. You are careening toward a suspension," and then to the warning not to cross the Rubicon. (Fr. 53, 60; May 41–42; Sept. 40–41; Aw. 40–41; *see* Beat 8(a).) The redundant heading therefore appears to be a vestige of *Frisco*'s cut to the cab.

(B) The skating lesson.

107. In *Frisco*'s "fun in the city" sequence, Willis goes from refusing to longboard to laughing on his back in six steps: told it will be fun, he refuses, is pushed into it, is told to lean ("Lean then!"), throws the instruction back ("I'm already leaning! You lean!") and ends laughing. (Fr. 87–88.)

108. Both 2021 drafts of *The Holdovers* transpose the action to a Boston skating rink and have the same six steps occurring, down to "Lean forward. Like you're falling." / "I am fucking falling!" (May 88–89; Sept. 83–84.)

109. The Awards Draft plays its skating scene silently, with Paul simply watching Angus from the sidelines. (Aw. 78–79; Exhibit F at Table 4 (p. 4).)

(C) The first summons and the complaints warning.

110. Early in *Frisco*, Willis is summoned to his boss in four steps: a messenger interrupts him at work; he defers, “Tell her I’m doing rounds”; he is told, “She said to tell you to come now”; and he grudgingly gives in. (Fr. 9–10.)

111. The May and September Drafts of *The Holdovers* contain all four, including the corresponding “Tell him I’ll see him after breakfast.” / “He says now.” (May 2; Sept. 2.)

112. The Awards Draft retains the messenger, the summons and the giving in, but removes the telltale “Tell him I’ll see him after breakfast” and “He says now.” (Aw. 2; Exhibit F at Table 5 (p. 5).)

113. *Frisco*’s boss, Margaret Brown, starts to close the meeting that follows with an explicit warning that further complaints will cost Willis his contract. (Fr. 13.) At the end of the May Draft’s meeting, Woodruff delivers the same warning: “I don’t need any more static from the parents, understand?” It is gone by the September Draft (May 9; Sept. 8–9; Exhibit F at Table 6 (p. 6)), but the warning remains implicit in the meeting, and is made explicit in Paul’s later remark that he “was on thin ice already.” (Aw. 42.)

(D) Other details.

114. In at least one place, the drafts also show dialogue being reassigned from the *Frisco* analogue to a different character. In *Frisco*, Amy asks Willis when he last had fun, his reply is comically long ago, and the “fun” in question does not sound very fun. In the May Draft, it is Angus who asks Paul when he last left campus and is given a long ago time, and an activity that does not sound especially fun. By the September Draft the question is Mary’s; by the Awards Draft the time and the underwhelming description are both gone. (Fr. 61–62; May 38–39; Sept. 37; Aw. 36; Exhibit F at Table 7 (p. 7).)

115. In both 2021 drafts, as in *Frisco*, a bellman shows the pair to their hotel room and the teenager raises which bed is whose: Amy asks, “Which bedroom do

you want?" (Fr. 52); Angus claims one, "I call the bed by the door" (May 84), or, in the September Draft, "Uh-huh. I call that one" (Sept. 79). The scene is absent from the Awards Draft. (Exhibit F at Table 8 (p. 8).)

116. In *Frisco*, Amy is fifteen and Willis "in his late forties or early fifties." In both 2021 drafts, Angus is fifteen and Paul is "50s." The Awards Draft makes Angus seventeen and removes Paul's age. (Fr. 2, 7; May 1, 3; Sept. 1, 3; Aw. 2, 3; Exhibit F at Table 9 (p. 9).)

**3. Traces of *Frisco* Left in the Final Screenplay of *The Holdovers*.**

117. The finished screenplay of *The Holdovers* retains further traces of *Frisco*: a gap in its own timeline, and a label carried over from *Frisco*.

(A) <u>Story days and the ten-day gap</u>.

118. Hemingson has described the day cards—the same ones that bear Payne's idiosyncratic error—as central to his writing process. Specifically, he has stated that the "blackout cards" were intended to "show the dates to orient people in place and time" and to serve as "temporal mile markers throughout the script."[36]

119. *The Holdovers* has no cards for story Days 2 and 3. Its title cards move abruptly from Day 1, December 18, to Day 4, December 21, with December 19 and 20 unmentioned and unaccounted for: the only such jump in Act 1, and the point at which the two works fall into step. From that day through Day 7, the two works present the same events in the same order on the same story days (*See* Substantial Similarity, Section C, Pace at ¶¶ 223-35).

120. In Act 3 both works skip forward twice, at corresponding points in the story. *Frisco*'s first skip follows Amy's death and the rule-breaking, and lands on Amy's funeral. (Fr. 110–111.) *The Holdovers* skips forward at the same point, from New Year's Eve to January 11. Paul and Angus are presumably still stranded alone together at the school for those ten days, but the missing time passes without

[36] WGF.

acknowledgment. (Aw. 95–97, 103.)

121. The screenplay's own account of the timeline contradicts its cards. At the start of the break, Paul tells the boys they will follow a school schedule for "the next two weeks" (Aw. 16). On the return to school Paul, pleading for Angus, says he "just spent two solid weeks with him" (Aw. 102), at the same point where Willis says he "only knew her for a short time" (Fr. 112). By the cards in *The Holdovers*, December 18 to January 11, it has not been two weeks. It has been twenty-four days.

122. Ten unaccounted-for days, and a "two weeks" the calendar contradicts, are consistent with a story-day structure carried over from another screenplay and fitted to a different calendar. The placing of the gap adds to that inference. *Frisco* skips forward at this point for a reason of its own: Amy has died, and the story jumps to her funeral. *The Holdovers* has no such reason. Paul and Angus are still at the school, and the screenplay skips the same stretch anyway.

(B) <u>A label—the "Handsome Man."</u>

123. Both screenplays introduce a minor character identified only as "Handsome Man," at the same point (Fr. 65; Aw. 65) in scenes built the same way. While the name itself may be generic, the moment is not. In both, the protagonist is drinking whiskey in a social setting and enjoying a rare moment of contentment. Willis, alone at the hotel bar with "[a] big one" of Scotch, has "[a] moment of quiet and peace"; Paul, handed "his glass of Jim" by Miss Crane early in her Christmas party (Aw. 62), "basks in this small intimacy" with her. In both works, he then sees the Handsome Man greeting or parting from women. In *Frisco*, the Handsome Man is "saying goodnight to TWO WOMEN who look like they are also models"; in *The Holdovers*, Miss Crane rushes to the door and "greets him with a deep kiss." The moment collapses: Willis "laughs ruefully into his drink"; "Paul's smile fades." (Fr. 65; Aw. 65; Exhibit F at Table 10 (p. 10).)

124. In each, the Handsome Man occupies the place the protagonist wants for himself. In *Frisco*, the Handsome Man is the model who appears beside Willis's

own wife and daughters on a hospital billboard Willis passes every day, and Willis toasts him bitterly as the "Happy Handsome Guy, right up there on the billboard with my family." In *The Holdovers*, the Handsome Man is the man for whom Miss Crane, on whom Paul has pinned his hopes, leaves Paul's side. (Fr. 5, 29; Aw. 65–67.) The Handsome Man designation is in every draft, but the Awards Draft adds the specific moment of contentment that precedes the sighting, as in *Frisco*.

(C) Matched elements at different points.

125. A writer who relocates a scene he has taken changes its position but keeps its construction. Twenty-two further incidents are matched in the two works but occur at different points in them. Several are whole scenes matched move by move, among them the step-parent dialogue, the leverage, the "not in here" rule and the farewell.

**4. Revisions That Move Toward *Frisco*.**

126. While the details in Section F.2 were being removed, other revisions brought the screenplay closer to *Frisco*. Most began between the May Draft and the September Draft.

(A) The New Year's Eve scene and the "not in here" rule.

127. Near the end of *Frisco*, Willis breaks a household rule: it is stated in the words "in here"; he walks through to the kitchen; he breaks it himself; the breach is completed; and the scene ends with the camera outside the room. The scene foreshadows the change in Willis that Amy has caused, and comes immediately before *Frisco*'s first skip forward in time, to Amy's funeral. (Fr. 110–111; Exhibit F at Table 11 (pp. 11–12).)

128. The May Draft has no corresponding scene; it fades from the Boston evening straight to "NEW SEMESTER – JANUARY 11, 1971." (May 106.) The September Draft fills that gap with a journey home, at the point where *Frisco* places its flight home, and a New Year's Eve scene, under a new "DECEMBER 31" day card. The new scene has the rule ("You're not deploying that ***in here***"), the

explosion and the window shot. (Sept. 100–101; Fr. 97; Exhibit F at Table 11 (p.12).) The scene comes before the skip forward in time that creates the ten missing days in *The Holdovers*.

129. The Awards Draft brings it closer to *Frisco* in two ways, adding the kitchen and having Paul break the rule himself by lighting the M-80 for Angus. (Aw. 95–96; Exhibit F at Table 11 (p. 12).)

(B) <u>“Right, Dad?”</u>

130. *Frisco*’s hotel check-in culminates in five steps and ends on the word “Dad”: “She’s just a crazy shopaholic, hey Dad?” (Fr. 51–52.)

131. The May Draft’s hospital admission has three of the five and does not end on “Dad.” The September Draft adds the ending, “We can pay cash. Right, Dad?”, and the Awards Draft adds the last missing move, the aside to Paul about the fictitious former wife: “I don’t want her dragging you to court again.” (May 44–45; Sept. 43; Aw. 43–44; Exhibit F at Table 12 (p. 13).)

132. Hemingson has described the idea of the check-in fraud, which bonds the two characters in a lie, as his own discovery: “I never thought of this before… I honestly stumbled across it — it was one of the light bulb moments for me in the movie.”[37] What he “stumbled across” is *Frisco*’s check-in fraud, which *The Holdovers* then conformed to in two steps.

(C) <u>The step-parent in financial terms.</u>

133. *Frisco*’s exchange ends with the step-parent identified and dismissed with “just,” reduced to money: “She used to be my stepmother, but my dad’s dead too now. So she’s really just the woman that is going to inherit my trust fund.” (Fr. 8.)

134. The May Draft has only the opening of the exchange: Paul assumes a living parent, and Angus replies that his father is dead. (May 74.) The September

---

[37] WGF.

Draft adds Paul's question ("But I thought your father...?") and a bare identification, "That's my new stepfather," with no "just" and no money. (Sept. 69–70.) The Awards Draft completes the exchange in *Frisco*'s terms, folding the identification and the dismissal into a single line: "That's just some rich guy my mom married." (Aw. 67; Exhibit F at Table 13 (p.14).)

(D) Other revisions.

135. The September Draft has Angus suggesting to a fellow holdover they visit Boston, where in the same exchange the May Draft has only "[g]o somewhere." (May 31; Sept. 30.) The Awards Draft adds the mother's broken promise to take Angus there: "You promised on the way we'd spend some time in Boston." (Aw. 15.)

136. The false name Angus gives the Cavanaughs is "Jeremy" in both 2021 drafts. (May 91; Sept. 85.) The Awards Draft renames it "Leonard," the name of a child in *Frisco*'s opening reprimand. (Aw. 80; Fr. 12; Exhibit F at Table 14 (p. 15).)

(E) The celebratory meal.

137. *Frisco* joins its mid Act 2 celebratory meal at the end ("Willis, Amy, Valerie and Danny all sit around a table at the end of a meal"), shows the group at ease ("Everybody is cracking up with laughter"), gives Willis a line in unusual good humor, and has Valerie tease him for it: "It doesn't sound so lucky, Jeff!" (Fr. 75.)

138. The May Draft opens on the end of the celebratory meal and Paul's appreciation ("This is incredible"), but no moment of ease and no tease; Mary answers by praising herself: "You're damn right." (May 77.) The September Draft adds the group at ease: "They exchange looks, a new sort of intimacy among them." (Sept. 73.) The Awards Draft turns Mary's reply into a tease of Paul's unaccustomed compliment, as in *Frisco*, and the new line begins with Valerie's first word: "***It*** that an actual compliment?" (Aw. 71; Exhibit F at Table 15 (p. 16) (emphasis added).)

139. The line in *The Holdovers* should begin "Is." The error is consistent

with a new line typed over *Frisco*'s line, leaving *Frisco*'s first word in place.

**5. The Drafts Reduce the *Evidence* of Copying, not the Copying Itself.**

140. The revisions did not remove what was taken from *Frisco*. Every scene, sequence and exchange alleged in the Substantial Similarity section is in the Awards Draft and the film, and most were already present in the May Draft. What the revisions removed was evidence of the source; what they left still shows it; and what they added was more of *Frisco*.

141. Several of the revisions toward *Frisco* added elements set out in the Substantial Similarity section. (F.4(A)–(C); Dialogue, the check-in lie, the step-parent reduced to money, and the "not in here" rule.) That pattern is not consistent with a screenplay developing independently of *Frisco*. It is consistent with a screenplay that kept drawing on *Frisco* while removing the details most likely to reveal it.

**G. Each Draft of *The Holdovers* Is a Separate Infringing Work.**

142. *The Holdovers* screenplay is reported to have been written over several years and in many versions. Hemingson has described writing twenty-three or twenty-four drafts, many of them partial.[38] Drafts were circulated as they were written. Editor Kevin Tent has described receiving approximately the first forty-five pages, "up to when the boys leave."[39] Paul Giamatti was sent "one if not two early drafts."[40] Producer Mark Johnson, acting through Gran Via, received drafts to review during development and read a complete script "well over a year" before

[38] David Hemingson, interview, Daniel Fee33 (YouTube), at 37:34, Jan. 24, 2024, https://www.youtube.com/watch?v=aoyLrR5C0h0.

[39] The Credits.

[40] Alexander Payne, TheWrap, Nov. 6, 2023, https://www.thewrap.com/the-holdovers-alexander-payne-interview-paul-giamtti-sideways-reunion/.

principal photography began in January 2022.[41]

143. Stephenson has obtained three drafts: the May Draft, the September Draft, and the Awards Draft. The remaining drafts are in Defendants' possession.

144. Under the Copyright Act, "where the work has been prepared in different versions, each version constitutes a separate work." 17 U.S.C. § 101 (definition of "created"). Each draft of *The Holdovers* that incorporated *Frisco*'s protected expression was therefore a separate unauthorized derivative work, and each copy of each draft was a separate unauthorized reproduction. (*See* Exhibit G at Table 50 (p. 65).)

145. The May Draft, the September Draft, and the Awards Draft each infringe Stephenson's copyright in *Frisco*. The Awards Draft, which corresponds to the released film, is the principal comparison in this Complaint. Exhibit F charts the differences among the three drafts, including passages in the earlier drafts that correspond more closely to *Frisco*.

146. On information and belief, drafts of *The Holdovers* that predate the May Draft contained still more of the *Frisco* detail that later drafts removed. These include the partial drafts Hemingson has described, the pages sent to Tent, and the drafts sent to Giamatti. This belief rests on, among other things: (1) the May Draft already contains details that make sense only as remnants of *Frisco*, including the "medical conference" line, the unnecessary hallway heading, and the summons exchange; (2) each of those details was reduced or removed in later drafts, and the same pattern, carried backward, indicates that earlier drafts contained more such material; and (3) by every account, the screenplay reached a complete first draft only after Payne received the 2019 draft of *Frisco* in late 2019.

---

[41] Mark Johnson, The Hollywood Reporter, Feb. 24, 2024, https://www.hollywoodreporter.com/movies/movie-features/the-holdovers-producer-mark-johnson-best-picture-interview-1235830691/.

147. On information and belief, drafts of *The Holdovers*, including drafts that predate the May Draft, were delivered to and reproduced by Johnson, Gran Via, Miramax, and Honest Scholar in connection with developing, financing, budgeting, casting, and producing the Film. Miramax's financing of the Film was announced in June 2021. Plaintiff is informed and believes that the May Draft, completed weeks earlier, is the draft on which that financing was agreed, and that the proceeds of the Film flow from that infringing work.

148. Stephenson did not know, and had no reason to know, of the unpublished drafts of *The Holdovers* until he obtained the May Draft years later. Before then he could not reasonably have known of their contents, including the *Frisco* material alleged in Section F that appears only in the drafts and not in the Film.

**H. *Merlusse* Does Not Account for the Similarities.**

149. Payne has claimed publicly that he took the premise of *The Holdovers* from Marcel Pagnol's 1935 film *Merlusse*: "I've spoken openly about the film I did steal the idea for *The Holdovers* from and it was a 1935 French film." By his own account, what Payne took was "[n]ot the story, but the same premise."[42] He has said he does not remember *Merlusse*'s story beyond its first reel: "I actually don't even remember how the story goes after that."[43]

150. For his part, Hemingson never watched *Merlusse*: "No, I really didn't study the film. I just sort of got the log line from AP, which was… teacher with wonky eye takes care of boys with nowhere to go at Christmas break, develops special relationship with one of them. That's it. That's what I had."[44]

[42] Alexander Payne, panel with David Hemingson and Kevin Tent, at 0:57, Nov. 9, 2023, https://www.youtube.com/watch?v=cn-irZ_C8ew.

[43] Alexander Payne, Q&A moderated by Joe McGovern, part 1, at 2:02, Dec. 2023, https://www.youtube.com/watch?v=F3l_foCWn9Q.

[44] David Hemingson, Santa Barbara Q&A, late 2023,

151. On Payne's own account, *Merlusse* supplied a set-up that "could work again with a completely different story."[45] The source of a premise does not explain how it was developed, and *Merlusse* cannot explain what *The Holdovers* shares with *Frisco*. None of the following is in it: the politician parent and the final warning; the single teenager left in the man's sole charge after a failed call to the parent; the step-parent reduced to money; the woman from his working world who travels with them and intervenes for the teenager; the leverage; the journey to a nearby city; the hotel with no single room, and its "medical conference"; the booking, the argument and the emergency, all on a single story day; the check-in lie casting the man as father; the event at which his hope is dashed and the teenager meets a sixteen-year-old; the celebratory meal, the request to see the city and the man relenting; the minor served alcohol and the group ejected; the second summons ending in dismissal; and the deferred ambition, stated tentatively, and the drive away. *See Merlusse* (Marcel Pagnol, 1935).

152. *Merlusse* never leaves the school, and its boys remain a group. Its teacher volunteers to stay with them, and at the end he is promoted, not fired.

153. Defendants may have borrowed a premise from *Merlusse*, but they took the architecture of their screenplay from *Frisco*.

## I. *The Holdovers* Achieved Commercial Success and Widespread Critical Acclaim.

154. Miramax produced and financed *The Holdovers*, which began principal photography in January 2022. Johnson produced the Film through Gran Via. Payne directed the Film, Hemingson received sole screenwriting credit, and Paul Giamatti portrayed its lead character.

---

https://www.youtube.com/watch?v=baPOMP6f-k8.

[45] Alexander Payne, Deadline Contenders panel, Nov. 2023, https://www.youtube.com/watch?v=igZz8FyLSrk.

155. Upon information and belief, Focus Features acquired the worldwide distribution rights, excluding the Middle East, from Miramax for a reported price of approximately $30 million.

156. On information and belief, the distribution rights acquired by Focus were conveyed through a chain of title involving Honest Scholar, Miramax Distribution Services, LLC, and Focus. Recorded documents reflect a transfer concerning *The Holdovers* from Nobrose Development, LLC to Honest Scholar, a subsequent transfer from Honest Scholar to Miramax Distribution Services, LLC, and later transfers from Miramax Distribution Services, LLC to Focus. Through those transactions, Honest Scholar and the Miramax entities authorized and enabled Focus's distribution and commercial exploitation of the Film.

157. Defendants initially released *The Holdovers* in just six domestic theaters on October 27, 2023. The film did not expand into wide release until November 10, 2023. Stephenson first viewed the film on November 7, 2023, when he attended a screening with a friend. Immediately after the screening, Stephenson told his friend that he believed the film had copied *Frisco*. It wasn't until Stephenson obtained the May, September and Awards Drafts of *The Holdovers* that he learned the full extent of the infringement.

158. Before November 7, 2023, Stephenson neither knew nor reasonably should have known of Defendants' infringement. Payne had twice passed on *Frisco*, giving Stephenson no reason to believe that Payne would nevertheless use its protected expression in another film. Pre-release publicity described the film only in general terms, revealed none of the protected expression alleged here, and repeatedly attributed its premise to *Merlusse*. Moreover, *The Holdovers* transposed *Frisco*'s characters, relationships, and events into a different setting, obscuring the copying in the marketing and advertising materials used to promote the Film. Only upon viewing the Film did Stephenson begin to recognize the substantial similarities described below. But the full extent and manner of Defendants' copying was

discovered later still, when Stephenson obtained the three drafts of *The Holdovers* screenplay and traced their appropriation of *Frisco*'s protected expression.

159. On information and belief, Focus exercised its worldwide distribution rights (excluding the Middle East) directly or through territorial sub-distributors, including in the United Kingdom, where it was released on January 19, 2024. Focus, Miramax, and Honest Scholar publicly promoted the Film as an original screenplay by Hemingson.

160. The Film generated nearly $49 million in worldwide theatrical box-office revenue.

161. Defendants promoted *The Holdovers* and its screenplay through awards campaigns, press interviews, panel discussions, public appearances, promotional materials, and other publicity that identified David Hemingson as the Film's sole credited screenwriter.

162. *The Holdovers* was widely acclaimed by critics and recognized as one of the year's outstanding films. The American Film Institute selected it as one of its ten motion pictures of the year, and it received five Academy Award nominations, including Best Picture and Original Screenplay.

163. The writing itself was a particular focus of that acclaim. Hemingson won the Writers Guild Award for Original Screenplay and received Academy Award and BAFTA nominations in the same category. Throughout the Film's promotion and awards campaign, he received sole screenplay credit and was publicly celebrated as the author of its story, characters, and dialogue.

164. Defendants continue to distribute and license the Film while presenting its screenplay as original. Stephenson has received no writing credit, payment, or participation in the proceeds from the exploitation of the work he alleges incorporates protected expression from *Frisco*.

**J. Defendants' Ongoing Exploitation of *The Holdovers***

165. Since the wide-scale theatrical release of *The Holdovers* on or about

November 10, 2023, Defendants have reproduced, distributed, licensed, publicly performed, advertised, marketed, promoted, and otherwise commercially exploited *The Holdovers* and its underlying screenplay in the United States and internationally through streaming services, subscription and transactional video-on-demand platforms, digital rentals and purchases, television exhibition, international licensing, physical home-entertainment editions, and other downstream and ancillary markets.

166. **Streaming.** *The Holdovers* began streaming exclusively on Peacock, NBCUniversal's subscription streaming service, on December 29, 2023, while the Film was still in its awards campaign. On information and belief, NBCUniversal, acting through UFEG and its affiliate Focus, arranged and licensed that exclusive window. The Film was subsequently licensed to Netflix for exhibition in the United States for a period in 2024, for approximately six months during 2025 and throughout 2026.

167. Netflix's reported viewing data reflect approximately 1 million views of *The Holdovers* during the second half of 2024, approximately 700,000 views during the first half of 2025, approximately 2.5 million views during the second half of 2025, and approximately 1.1 million views during the first half of 2026.[46]

168. Those reporting periods collectively account for approximately 5.3 million Netflix views of *The Holdovers*.

169. The Netflix figures represent only one component of the Film's overall

---

[46] Netflix, What We Watched: The Second Half of 2024, Feb. 26, 2025, https://about.netflix.com/en/news/what-we-watched-the-second-half-of-2024; Netflix, What We Watched: The First Half of 2025, July 17, 2025, https://about.netflix.com/en/news/what-we-watched-the-first-half-of-2025; Netflix, What We Watched: The Second Half of 2025, Jan. 20, 2026, https://about.netflix.com/en/news/what-we-watched-the-second-half-of-2025; Netflix, What We Watched: The First Half of 2026, July 16, 2026, https://about.netflix.com/en/news/what-we-watched-the-first-half-of-2026.

exploitation and do not account for theatrical admissions, Peacock viewing, Amazon Prime viewing, other streaming platforms, television exhibitions, digital purchases and rentals, physical-media sales and rentals, international licensing, airline and hotel exhibition, or other ancillary markets.

170. **Home entertainment and digital sales.** UPHE, NBCUniversal's home-entertainment division, distributed the Film on Blu-ray and DVD and, on information and belief, for digital purchase and rental through platforms including Amazon Prime Video and Apple TV.

171. **Rights holders.** On information and belief, Honest Scholar and Miramax Distribution Services authorized and derive revenue from each of these channels under the agreements through which Focus acquired the Film.

172. Upon information and belief, Defendants' ongoing distribution of *The Holdovers* has brought them tens of millions of dollars in licensing and other revenue.

173. Defendants' exploitation has also included the reproduction and distribution of the screenplay for *The Holdovers*. During the Film's awards campaign, Focus, together with Miramax and Honest Scholar, released an official Awards Draft of the screenplay for review and consideration by awards voters and members of the entertainment industry.

174. Through their continuing promotion, licensing, distribution, and public performance of *The Holdovers*, Defendants have continued to hold the screenplay and Film out to the public as original works authored solely by David Hemingson, without identifying Simon Stephenson or *Frisco*. Plaintiff has never authorized Defendants to use *Frisco* in creating, producing, reproducing, adapting, distributing, licensing, publicly performing, marketing, promoting, or commercially exploiting *The Holdovers* and has not received any authorship or screenwriting credit, license fee, purchase price, contingent compensation, profit participation, residual payment, royalty, or other remuneration arising from Defendants' exploitation of *The*

*Holdovers*.

175. Plaintiff is informed and believes, and on that basis alleges, that Defendants have received and continue to receive revenue, economic benefits, reputational benefits, and valuable commercial opportunities arising from their reproduction, distribution, licensing, public performance, marketing, promotion, and exploitation of *The Holdovers*.

## SUBSTANTIAL SIMILARITY

176. The two works are compared below on the elements on which the Ninth Circuit's extrinsic test looks for "articulable similarities": plot, themes, dialogue, mood, setting, pace, characters and sequence of events. **Exhibit G**, which sets out Tables 16-49, provides further support and visual rendering of the discussion below.[47]

177. The Ninth Circuit's extrinsic test is well suited to a case of this kind. A work that has been transposed, or recast, changes the surface detail but preserves the expression beneath it: the plot, the sequence of events, the characters, the theme, the pace and the mood. Those elements can be missed on a casual comparison, but they are what the extrinsic test isolates.

178. The elements below are therefore not "random similarities scattered throughout the works," but a "pattern, synthesis, or design" that is both "particular" and "coherent": the same incidents, built the same way, organized around the same

[47] The complaint describes each matched scene or exchange in its principal steps. The accompanying tables set out the same matches, beat by beat, with each beat highlighted on the reproduced pages of both works; where a table shows more beats than the steps described here, the additional beats reflect the greater detail demonstrable on the page. Additionally, several passages of *Frisco* each correspond to two passages of *The Holdovers,* and the tables show each correspondence separately. Each is pleaded on its own terms: where a single source scene is split between two scenes of a later work, both halves remain matched, and neither correspondence depends on the other.

three through-lines, in the same order. *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984); *Yonay v. Paramount Pictures Corp.*, No. 24-2897, slip op. at 19 (9th Cir. Jan. 2, 2026) (quoting *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1074 (9th Cir. 2020) (en banc)).

**A. Plot and Sequence of Events.**

179. The two works share both a plot and a sequence of events. The plot is built from forty-six matched incidents; twenty-four of those incidents occur in the same order in both works. (*See* Exhibit G at Table 16 (p. 1-2)). Within each of the forty-six incidents, the similarity extends to the internal architecture and expression of the scene, not merely the abstract type of event it depicts.

180. In both works, the story is constructed from three interwoven through-lines. The central spine of each story is the relationship between Willis/Paul and Amy/Angus: imposed against Willis/Paul's wishes, marked by Amy/Angus's resistance to the man's authority, transformed by a medical emergency, deepened by shared outings in a city, and ended in a restrained farewell without an embrace, after Amy/Angus has changed Willis/Paul forever. The second through-line is the trajectory of Willis/Paul's job, placed in jeopardy early, leveraged by Amy/Angus, and lost near the end when the man refuses to placate a pair of aggrieved parents, which gives him the release he has needed. The third is the niche historical interest Willis/Paul and Amy/Angus share, which underlies the dream Willis/Paul abandoned in youth, recurs during the unlikely pair's time together, and supplies the purpose of the journey the man sets out on at the end.

181. The following twenty-four beats appear in sequence in both works.

182. **Beat 1. The opening montage.** Each work opens with a montage establishing its institution, including multiple images of decline, before either lead appears on screen. In *Frisco* the images include "abandoned gurneys" and a "faded sign." In *The Holdovers*, they include a "town in decline" and a "shuttered textile mill." Both works reprise the montage in Act 3, again without the two leads. (Fr. 1;

Aw. 1; Film 0:00:00–0:01:00.)

183. **Beat 2. Willis/Paul introduced, and the first summons.** Each work begins by introducing Willis/Paul, his unsatisfactory home life, and his workplace crush through the same four steps, though *The Holdovers* inverts the order of (a) and (b).

(a) **We meet him at work, tired, unkempt and complaining inappropriately about his young charges.** Willis grumbles that everybody who comes in "only ever wants to talk to me about their own problems." Paul calls his pupils "Lazy, vulgar, rancid little Philistines."

(b) **We see his humble sleeping arrangements.** Willis sleeps on a camp bed in a junk-filled garage. Paul's unmade bed is in a cluttered room in his staff quarters (Film 0:03:50)

(c) **After opening the door of his residence he encounters the colleague he has, or will have, romantic designs on.** In *Frisco* she is Susie, the hospital social worker and his separated wife, who "bustles." In *The Holdovers* she is Miss Crane, the school secretary, who is "bright-eyed." In both works, this unrequited love character is the first principal character we meet after Willis/Paul.

(d) **He is told the boss wants him, attempts to put it off, then acquiesces.** In *Frisco*, a nurse tells Willis the boss is on the phone; he answers "Tell her I'm doing rounds," but when told "She wants you to go to her office," he "wearily trudges off." In *The Holdovers*, Miss Crane delivers the summons in the doorway encounter: through the closed door, Paul calls "I'm busy right now!" Told that Dr. Woodrup wants to see him, he opens the door to her and says, "I'll see him presently." (Fr. 2–10; Aw. 2;

Film 0:03:50–0:04:29.).

184. **Beat 3. The first boss meeting.** The boss praises Willis/Paul's ability, takes him to task over a politician's child, and leaves him under threat if there are further complaints.

(a) **The boss praises him.** Willis is "the best pediatrician we have on staff"; Paul is "an excellent teacher."

(b) **The talk turns to trouble with parents,** centered on a politician's child: a Congresswoman in *Frisco*, a Senator in *The Holdovers*.

(c) **The man disparages the intelligence of the politician or the child, doubling down with hyperbole.** Willis: "It's pretty moronic. In more advanced cultures it's probably attempted murder." Paul: "That boy is too dumb to pour piss out of a boot. A genuine troglodyte."

(d) **He appeals to the boss by first name and then to a higher professional authority.** Willis: "Come on, Margaret," and then his own role at the Congress of Allergists. Paul: "Come on, Hardy," and then the revered former head, Dr. Green.

(e) **The boss is unmoved, and returns to the original grievance.** "Margaret looks unimpressed": "This isn't about hazelnuts, Jeff. It's about complaints." Hardy "rubs the bridge of his nose. This bullshit again," and comes back to the original complaint: "I begged you -- begged you -- to give the kid a C-minus."

(f) **The threat of further complaints hangs over him.** In *Frisco* it is explicit: "if we have any more complaints... Portland Children's will not be renewing your contract." In *The Holdovers* it is implicit, and confirmed later by Paul when he says, "I was on thin ice already" (Aw. 42).

Before the meeting in *The Holdovers* and immediately after it in *Frisco*, his isolation

is shown in a busy workplace dining room where he sits alone or only his chair is empty. (Fr. 10–14; Aw. 5–9; Film 0:09:05–0:11:52; Exhibit G at Table 17 (p. 5-8), fifteen matched beats.)

185. **Beat 4. Thrown together.** An unexpected arrival leaves Willis/Paul at risk of being stuck alone with Amy/Angus for a prolonged period of time. Willis is sitting with a mug in a train's quiet carriage when Amy appears. Paul is sitting with a mug in the library when a helicopter arrives that will take the other boys away, leaving only Angus in his charge. Each breaks the silence with an exclamation or a curse. (Fr. 38–39; Aw. 33–34; Film 0:40:59.)

186. **Beat 5. The failed calls and the injured child.** Willis/Paul makes phone calls to avoid being left with Amy/Angus, the attempt founders on the mother figure's neglect, and Amy/Angus's hurt comes out in one line and a stare.

(a) **Each makes two rounds of calls, one providing information and one not.** Willis' unsuccessful call comes first, is made from the train and fails because of the line; Paul's unsuccessful call occurs off-screen, and its failure is implied.

(b) **He calls with Amy/Angus at hand.** Willis calls from the station platform with Amy standing beside him, "looking bored." Paul calls from the office while "The boys peer through the office window." In neither work is the other end of the call seen or heard.

(c) **The calls founder on the mother figure.** Anne (Amy's step-mother) refuses to collect Amy. Judy (Angus' mom) is away on a honeymoon excursion and cannot be reached.

(d) **Amy/Angus's injury at being abandoned comes out in a one line explanation and a stare.** Amy: "Because she cares enough to drive five miles but not a hundred, okay?" She "stares out the window." Angus: "Excursion." He "stares at the empty horizon."

(Fr. 40–43; Aw. 33–35; Film 0:41:58–0:42:26.)

187. **Beat 6. The hotel booking, the scorned gift, the permission and the hotel infraction.** The hotel booking is built from the same three moves; Amy/Angus mocks or disdains a small gift from Willis/Paul, abuses a limited permission, and is caught out in a hotel-related infraction. The steps below follow *Frisco*'s order; in *The Holdovers*, the booking comes last and is itself the infraction, made from a school pay phone rather than at a hotel desk.

(a) **The hotel booking runs in three moves: no single room, a suite instead, and Amy/Angus paying.** In *Frisco*, Willis asks for a second single room and is told the hotel is fully booked. The receptionist offers the Imperial Suite, and Amy says "We'll take it" and hands over her stepmother's credit card. In *The Holdovers*, Angus, on the phone, says "if you don't have a single room, I'll take a junior suite or the equivalent" and "No, no credit card. I'll pay cash or traveler's checks."[48]

(b) **Willis/Paul's small gift is met with scorn.** Amy mocks the twenty dollars Willis gives her to put in her sock ("Even ignoring the whole sock thing, that's ridiculous"); when Paul shares Miss Crane's Christmas cookies, "Angus stares at this loser."

(c) **Limited permission is given.** Willis lets Amy go out in San Francisco on condition she is back at the hotel before dark; Paul lets Angus go to the bathroom.

(d) **Willis/Paul catches Amy/Angus red-handed in a hotel-related infraction.** Amy is caught out after dark when she should be back at the hotel; Angus is caught booking the hotel when he should be in the bathroom. (Fr. 51–53, 59; Aw. 38–39; Film

[48] The May 2021 Draft's "medical conference" line falls within the booking.

0:49:01; Exhibit G at Table 18 (p. 9-16).)

188. **Beat 7. The caretaking argument.** Immediately after being caught in the hotel-related infraction, Amy/Angus argues with Willis/Paul in the same six steps.

(a) **At first Amy/Angus is nonchalant, despite being caught red-handed.** Amy asks, “You like Ferlinghetti?” Angus carries on with the booking, “holding up a finger.”

(b) **Amy/Angus disputes his authority.** Amy: “You’re not my dad.” Angus: “None of your business.”

(c) **He insists that he is responsible for them.** Willis: “I’m in loco parentis.” Paul: “I’m looking after you.”

(d) **Amy/Angus mocks the role.** Amy: “You said that you are a crazy parent.” Angus: “Like what, like my warden? Like my butler?”

(e) **He threatens punishment.** Willis: “if you were my daughter I’d probably.” Paul: “That’s a detention.”

(f) **Amy/Angus scoffs at the man’s impotence.** Amy: “You’d what, Jeff? What would you do?” Angus: “one big fucking detention!” (Fr. 59–60; Aw. 39–40; Film 0:49:10–0:50:02; Exhibit G at Table 18 (p. 9-16).)

189. **Beat 8. The medical emergency.** The emergency follows the same four steps in the same order, with other exchanges between the first and second: a joke about the body answered with a punishment, a moment when it is not clear anything is wrong, a first visible sign in the arm, and Willis/Paul taking charge.

(a) **In a matched dramatic irony, Amy/Angus jokes that their body is failing. unaware of what is about to happen, and Willis/Paul answers by invoking the punishment for breaking the rules.** Amy: “I’m dying of cancer, Jeff.” Willis: “Well, you should have thought about that before you broke curfew.”

Angus: “Without sufficient exercise, the body devours itself.” Paul: “You are careening toward a suspension!” In each, the punishment is a real one, unlike the one Amy/Angus has just scoffed at (Beat 7(f)): Amy loses the dinner she was promised, and Angus faces suspension.

(b) **Once the incident starts, there is a brief calm before the storm.** Amy “has started to stare straight ahead at Willis” and “does not reply”; Angus “topples clumsily -- and hard -- on the other side,” and there is then “a beat”, which plays as a moment of pause on screen.

(c) **The first visible sign of injury is in the hand or arm.** In *Frisco*, one of Amy’s fingers twitches, then her hand and arm, before the seizure; in the film, Angus flails his unaffected arm. One of Amy’s fingers twitches, and “[t]he twitch spreads to Amy’s hand, and then her arm”; Angus “rises to his knees, his LEFT ARM DANGLING oddly.” Amy progresses to a tonic-clonic seizure, her arms and legs jerking rhythmically; in the film, Angus flails his unaffected arm.

(d) **Willis/Paul gets Amy/Angus to the emergency room at once.** (Fr. 62–63; Aw. 41–42; Film 0:51:00–0:51:20; Exhibit G at Table 18 (p. 9-16).)

190. **Beat 9. The hospital, the wooziness and the drink.** At the hospital the emergency proves manageable; Amy/Angus is discharged the same evening, woozy from the incident or its treatment, and Willis/Paul ends the day with a large whisky.

(a) **Imaging already performed off-screen shows the episode to be surprisingly manageable, despite how serious it looked:** a scan in *Frisco*, an X-ray in *The Holdovers*.

(b) **Medication is given, and Amy/Angus is discharged the same**

**evening.**

(c) **Still woozy, Amy/Angus repeats the same demand of Willis/Paul.** Amy asks to see the sea lions; Angus asks for a beer.

(d) **Willis/Paul orders a whisky and is given a large one.** Willis asks for "A big one"; Paul is served "a double Jim."

The emergency sees Willis/Paul exercise the responsibility he claimed in the argument at Beat 7, a key development in his relationship with Amy/Angus. (Fr. 63–65; Aw. 44–48; Film 0:52:55–0:55:49; Exhibit G at Table 18 (p. 9-16).)

191. **Beat 10. Breakfast and the request.** The morning after the emergency, it is brushed aside at breakfast, and Amy/Angus then talks Willis/Paul into taking them with him to an event.

(a) **At breakfast the night's emergency is passed over lightly:** "Fine," in *Frisco*; "I don't know anything about that," in *The Holdovers*. Amy/Angus's wooziness has gone, and neither it nor the medication given that night (the seizure medication/the Percodan) is mentioned again.

(b) **At the breakfast table in *Frisco*, and at the kitchen table in *The Holdovers*, Amy/Angus asks in the same construction.** Amy: "I want to come to your talk." Angus: "I want to go to the party."

(c) **Willis/Paul offers an excuse.** Willis: "You're not a delegate. You don't have a pass." Paul: "She didn't mean it. We were just making small talk."

(d) **Amy/Angus proposes a way round it, and he rejects it.** Amy: "You can put me on the guest list." Willis: "There isn't a guest list." Angus: "Mary can take me." Paul: "No, that's not how it works."

(e) **He relents,** on the same page in *Frisco* and by the next scene in *The*

*Holdovers*. (Fr. 67–68; Aw. 54–56; Film 1:01:59, 1:03:58–1:04:39; Exhibit G at Table 20 (p. 19-24).)

192. **Beat 11. Getting ready alone.** Willis/Paul gets ready for the event in a run of solo scenes that ends by exposing his romantic hope for the evening ahead. Each gets ready at a mirror in his temporary accommodation, with a fresh shirt and tie, in scenes where no two characters converse. The sequence ends on an ineptly comic action that telegraphs his romantic hopes for the evening. Willis leaves Susie a clumsy message saying he hopes she will come to the conference. Paul sniffs under his arms and sprays air freshener there.

193. The day of the event each also has a wordless solo moment of physical-comedy failure, Willis's bellyflop and Paul's hopeless football throw, each staged as promise, action and failure: Willis "draws his hands up above him as if about to make a graceful dive. And then bellyflops in"; Paul "stares at it, then picks it up and throws it. It's the most awkward throw ever." In *Frisco*, the bellyflop falls within the preparations for his talk; in *The Holdovers*, the throw takes place in Beat 10, between the breakfast and Angus's request to go to the party.

(Fr. 69–70; Aw. 55–57; Exhibit G at Table 20 (p. 19-24).)

194. **Beat 12. The event: the love interest arrives and the man's specialty is misstated.** At the crowded event Amy/Angus meets a sixteen-year-old love interest, and during their introduction Willis/Paul's specialty is misstated in the same way.

(a) **A sixteen-year-old love interest is introduced,** with whom Amy/Angus will have a romantic first: Danny in *Frisco*; Elise, who gives Angus his first kiss, in *The Holdovers*.

(b) **During that introduction, the man's niche specialty is misstated.** In *Frisco*, Danny refers to "the whole cashew nut thing," whereas Willis is an expert in Hazelnuts. In *The Holdovers*, Miss Crane asks about Paul's specialty, "History, right?", and is

corrected with the exact term: “Ancient Civilizations, yes.” (Fr. 70; Aw. 58–59, 62; Film 1:06:04–1:07:21, 1:10:50; Exhibit G at Table 20 (p. 19-24).)

195. **Beat 13. The event goes wrong for Willis/Paul.** At the event Willis/Paul’s romantic hope is raised and dashed, his expertise falls flat, his mood sinks, and Amy/Angus’s intervention interrupts his suffering.

(a) **A misreading raises his hope, and its correction dashes it.** In *Frisco*, an auditorium door opens and Willis takes it for Susie’s (his separated wife’s) arrival; it is just Valerie (a new friend). In *The Holdovers*, Miss Crane kisses Paul and he takes it for an overture; but it was just the mistletoe.

(b) **His expertise falls flat.** Willis’s “never be hazy about hazelnut allergy” meets “disinterested” delegates. Paul’s “Aeneas carried mistletoe when he descended into Hades” is answered with, “Huh.”

(c) **His mood sinks as the hope fades.** In *Frisco*, “Willis’ gloom visibly deepens.” In *The Holdovers* Miss Crane’s presumed boyfriend arrives at the party, and “Paul’s smile fades.”

(d) **Amy/Angus interrupts to change the mood.** Amy praises Willis’ talk: “I thought this was really an excellent talk.” Angus asks for his help: “Mr. Hunham, could you come with me, please?” (Fr. 72–74; Aw. 62–66; Film 1:11:01–1:15:00; Exhibit G at Table 20 (p. 19-24).)

196. **Beat 14. The aftermath and the contrast.** Straight after the event, Willis/Paul writes off the evening and disparages Amy/Angus’s new love interest, while an energized Amy/Angus wants to keep the evening going.

(a) **He pronounces the evening a loss.** Willis: “What a goddamn waste.” Paul: “That was a disaster.”

(b) **He disparages the love interest.** Willis: "not her boyfriend. She met him on the street today." Paul: "some silly girl."

(c) **Amy/Angus wants to carry on.** Amy wants Willis to "take us all to dinner in Chinatown"; Angus says "we'll come back."

(d) **He refuses.** Willis: "No. I can't." Paul: "Out of the question." (*The Holdovers* plays (b) last, after Paul's refusal.)

Willis relents, so the celebratory meal follows that night. Paul does not, and *The Holdovers*' meal is Christmas dinner the next day, the point from which the story days fall out of step. (Fr. 73–75; Aw. 66–67; Film 1:15:58–1:16:48.)

197. **Beat 15. The celebratory meal.** Each work joins the group at ease at the end of a celebratory meal, with Willis/Paul in unusually good humor, which Valerie/Mary teases. In *Frisco*, the meal is "to celebrate the occasion of you talking at the Congress of Allergists"; in *The Holdovers*, it is Christmas dinner. The stage directions specifically join each group at the end of the meal: they "all sit around a table at the end of a meal"; they "finish a lovely Christmas dinner." They likewise show the characters visibly at ease: "Everybody is cracking up with laughter"; "They exchange looks, a new sort of intimacy among them." The first line spoken is Willis/Paul's, in unusually good humor, and Valerie/Mary teases him for it. Valerie: "It doesn't sound so lucky, Jeff!" Mary: "It [sic] that an actual compliment?" (Fr. 75; Aw. 71; Film 1:21:08.)

198. **Beat 16. The request to see the city.** As the meal ends, Amy/Angus asks to see the sights of San Francisco or to visit Boston. Willis/Paul refuses, Valerie/Mary intervenes, and the next scene shows both the journey there and their arrival at the Golden Gate Bridge or in Boston.

(a) **Amy/Angus says where they want to go.** Amy: "Have you even seen any of the sights of Frisco?" Angus: "Okay, I want to go to Boston."

(b) **Amy/Angus asks for specific things, in an anaphoric list.** Amy:

"What about the Golden Gate Bridge? What about the steep hills? What about the sea lions?" Angus: "I want a real Christmas. I want to go ice skating. I want to see a real Christmas tree with ornaments…"

(c) **Willis/Paul refuses.** Willis: "It's too late now." Paul: "It's out of the question."

(d) **Valerie/Mary intervenes.** Valerie: "It's not really too late, is it?" Mary: "take the kid to Boston."

(e) **He gives way, and the next scene is the journey,** by cab or car. (f) **We see them reach the place asked for:** the Golden Gate Bridge; Boston. (The thing asked for, the sea lions or the skating, follows later in the city sequence.) (Fr. 80; Aw. 72–73; Film 1:22:12–1:22:53; Exhibit G at Table 21 (p. 25-26).)

199. **Beat 17. The shared-interest visit.** Willis/Paul and Amy/Angus visit a place tied to their shared historical interest, one eager and one reluctant, and the beat ends in a put-down of Willis/Paul.

(a) **They visit a place tied to the shared interest.** In *Frisco*, it is the Sixth Gallery where Ginsberg first performed "Howl"; in *The Holdovers*, the Greek galleries of the Museum of Fine Arts. Amy and Paul are eager; Willis and Angus are reluctant.

(b) **The reluctant one wants to leave.** Willis: "And now we've seen it we can go home." Angus: "Are we almost done?"

(c) **The eager one's enthusiasm meets deflation.** Amy: "This is awesome." Willis: "It's very loud." Paul: "Here. What do you see?" Angus: "I don't know. A bunch of pottery."

(d) **The bickering turns into a put-down of Willis/Paul by Amy/Angus.** In *Frisco*, it is mockery: "He likes songs about unicorns sung by men who sound like women." In *The*

*Holdovers*, it is harsher: "most of the kids pretty much hate you." (Fr. 81–83; Aw. 77–78; Film 1:29:22–1:30:27.)

200. **Beat 18. Fun in the city.** The city sequence plays three matched beats in the same order, and in one of the first two, Amy/Angus encourages Willis/Paul and wins him over.

(a) **An activity with a risk of falling.** In *Frisco*, Willis longboards, encouraged by Amy, who tells him "[y]ou guys should have a shot on Danny's longboard" (and coached by Danny, who tells him "If you sit down it is actually technically impossible to hurt yourself"); he ends up "still laughing... That was great." In *The Holdovers*, Angus ice skates while Paul watches from the sidelines, "quietly marveling at the lad's vitality."[49]

(b) **A fun activity peculiar to the place.** San Francisco's sea lions; Boston's candlepin bowling, where Angus coaches Paul, "Just hold on tightly, then let go lightly," and Paul "glares, then tries it. Much better."

(c) **A busy public place, staged the same way.** Though one is a police precinct and the other a bowling-alley bar, in each, Willis/Paul turns his professional standing or learning on a uniformed stranger and is met with weariness, while Amy/Angus is visible in the distance consorting with the opposite sex and Willis/Paul reacts to this. In *Frisco*, "Through the window, Willis sees that Amy and Danny have started kissing. He starts banging on the window"; in *The Holdovers*, "In the distance, Angus now bowls with the girls,' and Paul 'shoots amused looks at Angus."

[49] The May 2021 Draft's version of the skating scene closely replicates the *Frisco* scene. *See* Section F.2(B), supra.

Willis's "Officer. I'm a children's doctor" and Paul's lecture on St. Nicholas meet the same weariness: "The Officer sighs and wearily commences to write up his notes"; "The Bartender and Santa just stare at him." (While a Santa Claus costume may not traditionally be called a uniform, it is Paul who calls it that: "Your uniform, festive as it is, is historically inaccurate.") (Fr. 86–92; Aw. 78–79, 85–87; Film 1:38:50–1:40:13.)

201. **Beat 19. The slip-away.** Near the end of the city stay, one of the pair slips away under a false pretext, is caught by the other, and the slip-away leads to the fulfillment of Amy/Angus's wish. Willis slips away to Valerie ("I popped down to the gym"); Angus slips away to his father ("I'm going to the bathroom"). The other has worked it out: Amy at the end of the sequence ("Totally busted... In the clothes you had on last night"); Paul at its start ("Were you planning this the whole time?"). The slip-away leads to the fulfillment of the wish Amy/Angus planted at the end of Act 1 (Fr. 31; Aw. 15, 29, 43): Amy's wish to sleep with a boy is fulfilled while Willis is away; Angus's reason for wanting to visit Boston turns out to have been "[t]o see my dad." (Fr. 93–95; Aw. 87–90; Film 1:41:23–1:44:15.)

202. **Beat 20. The daytime journey back.** In each work, the scene after the city sequence is a quiet daytime journey home, opened by a one-line direction: "The flight from SFO to PDX is quiet"; "The threesome ride home in silence..." Willis and Amy return to Portland and the hospital; Paul and Angus to the school. (Fr. 97–99; Aw. 95.)

203. **Beat 21. Back at work.** Back at the institution nothing seems to have changed, until a lingering look at the end of the scene.

(a) **Willis/Paul wears the clothes we first saw him working in.** Willis is "wearing his Goofy tie." Paul, in the Film, wears the brown corduroy suit, green sweater and light shirt of his first scene (only the pattern of his red bow tie differs).

(b) **He is met with mundane routine that calls back to his first scenes:** "forty-eight hours of diarrhoea"; "enlighten yourselves about the Peloponnesian War."

(c) **He deals not with Amy/Angus but with another young person:** a seven-year-old patient; the sunburned Kountze.

(d) **The scene ends on a look that shows what happened has not been forgotten.** "Willis stares at the door to Amy's room"; "Angus and Paul share a conspiratorial smile." (Fr. 103–104; Aw. 97–98; Film 0:04:21, 1:55:55, 1:56:35.)

204. **Beat 22. The second summons and the parents' meeting.** A second summons brings Willis/Paul before his boss and a pair of aggrieved parents who want a specific concession, and he refuses it. The summons and the meeting run in the same eight steps, apart from where the mother's first retort falls.

(a) **The summons precedes the meeting, its gravity at first lost on him.** Willis: "Am I being presented with an award of some kind?" Paul: "I never called to thank you for... your party." The parents want a concession. In *Frisco* it is an apology: "if you apologize to them then they won't proceed to a formal complaint." In *The Holdovers*, it is an admission that Angus tricked Paul: "however he manipulated your sympathies or slipped the leash, just tell us."

(b) **The meeting opens on a misidentification, corrected.** In *Frisco*, Willis takes Margaret's thanks for coming in as meant for him: "I meant Mr and Mrs Lakovic." In *The Holdovers*, Woodrup (headmaster) calls Stanley Angus's father and is corrected.

(c) **He pauses before answering.** Willis: "I'm- (Beat.) I mean- (Beat.) I-" In *The Holdovers*, the Clotfelters and Woodrup "look at Paul expectantly for a long beat."

(d) **His answers give the parents nothing and harden into open provocation.** Willis: "She wants me to say I'm sorry. But I can't. That's because I'm not sorry." Paul: "I took him to see his father. In fact, I convinced him to do so" and then "I don't give a shit."

(e) **The boss rebukes him with a single word, his name.** Margaret: "Jeff." Woodrup: "Hunham!"

(f) **The mother retorts twice.** In *Frisco*, Mrs. Lakovic: "You said a doctor not believing in vaccination was like a chef not believing in broiling" and "Mrs Brown, you said that if we came here he was going to apologize." In *The Holdovers*, Judy (Angus' mother): "This is a family matter. You had no right to interfere" and "Do you understand what you've done?" (In *The Holdovers*, Judy's first retort comes earlier, straight after Paul's refusal; Table 22 pairs it outside the sequence.)

(g) **The boss disclaims responsibility for the consequence.** Margaret: "Jeff, if these people complain there won't be anything I can do about your position." Woodrup: "You did this to yourself, Hunham. Not me."

(h) **The meeting ends on his parting shot.** In *Frisco*, when asked "But who will cover allergy?", Willis answers "Maybe Jenna [the family friend who suggested the Lakovic's use herbal vaccinations] can." In *The Holdovers*, Paul tells Woodrup he is "penis cancer in human form."

In each, the man stands on his professional judgment rather than give the parents what they came for: Willis as their child's doctor, Paul as the boy's teacher ("He's got enormous potential"). The scene resolves the conflict set in Beat 3. (Fr. 104–105, 114–115; Aw. 98–102; Film 1:57:06–1:57:23, 1:58:04–2:02:01; Exhibit G at Table 22 (p. 27-29).)

205. **Beat 23. The youthful ambition, stated tentatively.** Asked what he will do next, Willis/Paul answers tentatively with the youthful ambition set up earlier: a journey tied to the shared interest. In *Frisco*, Willis is asked, "But if we fire you what will you do?" and answers, "I might drive across the United States... I'm going to look for the pearl" (harkening back to Jack Kerouac's *On the Road* and Willis's abandoned ambition to travel across America). In *The Holdovers*, Paul is asked, "Have you decided where you're going to go?" and answers, "Maybe I'll start in Carthage"; Mary then names the purpose, handing him a leather-bound notebook "For your monograph" (harkening back to Paul's unfinished monograph of Carthage). (Fr. 115; Aw. 103; Film 2:03:44–2:04:11; Exhibit G at Table 23 (p. 30-31).)

206. **Beat 24. The departure and the symbolic object.** Willis/Paul drives away in a changed vehicle, and an object that marked his lowly place at the institution makes its last appearance with its meaning reversed. Willis leaves in an RV and Paul in his Nova towing a U-Haul. What is specific is not the driving-away ending but the device used with it, its precise meaning and symbolism within this story, and the ultimate goal of this travel: to fulfil the once-abandoned youthful dream that stems from the niche interest he shared with Amy/Angus.

(a) **An object stands for his lowly, unappreciated place at the institution:** In *Frisco*, the billboard that advertised the hospital but featured the Handsome Man in Willis's place; in *The Holdovers*, the cognac the Board of Trustees gifted the headmaster, even though Paul is the one stuck there over the holidays.

(b) **The object is planted in the opening pages** (Fr. 5; Aw. 6) **and seen again in Act 1** (Fr. 29; Aw. 25).

(c) **It makes a last appearance with its meaning reversed,** the sign of his old life now marking his triumph over it. In *Frisco*,

> "WORKMEN are changing the Ventran advert [with an actor in Willis' place] for one that features a picture of a PEARL [amplifying the Kerouac reference]." In *The Holdovers*, Paul "takes a swig [of the gifted cognac], swishes it around like mouthwash and spits it out the window."

Each script's last image is the vehicle departing. In *Frisco*, Willis "puts his foot to the floor, and drives off into the distance." In *The Holdovers*, the car "speeds away, disappearing in the distance." Then THE END. (Fr. 118; Aw. 106–107; Film 2:07:55–2:08:56, the cognac at 2:08:24.)

**1. Elements that Recur Out of Order.**

207. Twenty-two further closely matched elements feature in the two works. (*See* Exhibit G at Table 24 (p. 32).) These are shared plot elements in their own right; what they do not share is their exact position. Several are whole scenes matched beat by beat, discussed below under the sub-section Dialogue: "the minor and the alcohol" (sixteen matched beats, Exhibit G at Table 27 (p. 36-39)), the "not in here" rule (Exhibit G at Table 28 (p. 40-41)), and the "farewell" (Exhibit G at Table 29 (p. 42-44)).

208. Exhibit G at Table 24 (p. 32) lists each of these twenty-four beats with the relevant page in both works and the distance it has moved. Most of the reordering is of little significance: "the minor and the alcohol," for example, comes early in the city sequence in *Frisco* and at its end in *The Holdovers*. The largest displacements come from three shifts: the Companion's three friendship beats fall early in *Frisco*'s Act 2 and late in *The Holdovers*' Act 1; *The Holdovers* reaches its city midway through Act 2 rather than at its start; and in Act 3, *Frisco* sends Willis back to work before its first jump forward in time, *The Holdovers* after it. The remaining matched elements are pleaded below under Characters, Pace, Dialogue, and Theme, where their position in the story is not the claim.

**B. Characters.**

209. Each principal character and nearly every minor character in *Frisco* has a counterpart in *The Holdovers* who performs the same function in the narrative.

210. **The Man.** *Frisco*: Dr. Jeff Willis, hospital pediatrician and allergist, late 40s or early 50s (mid-to-late 50s in *Frisco* 2019 Draft). *The Holdovers*: Paul Hunham, teacher of ancient civilizations, 50s in the 2021 drafts (the Awards Draft gives no age). A talented but cantankerous professional at a residential institution for children, he harbors a near-forgotten youthful ambition, rooted in the interest he shares with Amy/Angus, that only travel can fulfil; his attraction to a livelier female colleague is not returned; and he is made responsible, against his will, for one teenager, who teaches him to stand up for himself at the cost of his job.

211. Weary and mildly unkempt, he speaks to his young charges in an inappropriately candid register that goes over their heads and has largely given up on life: he has not had fun since 1998 or rarely leaves campus (Fr. 61–62; Aw. 36). His failings mean he owes his job's longevity or existence to others: Margaret Brown tells Willis, "Susie is the only reason we've let you go on for so long" (Fr. 13); Paul says of Dr. Green, "He'd always believed in me. So he gave me a job" (Aw. 83).

212. Willis has a family and Paul does not, but Willis's family has largely banned him from their home (Fr. 20–21), so the effect is the same: a loveless man who lives in humble and cluttered quarters, his family's garage or a small apartment on campus. Other specific resemblances include: both reclassify the trip to the city for their own purposes, for Willis, the conference: "conference, vacation - there is kind of a gray area there" (Fr. 33), for Paul, the Boston holiday: "I suppose we could call it a field trip" (Aw. 73); both claim an old-fashioned attitude to sex when Amy/Angus raises it (*see* Dialogue at ¶ 240, Amy/Angus as Willis/Paul's romantic adviser) and both tell the teenager they reject religious belief: Willis that "when you are dead you are dead" (Fr. 46), Paul that he does not believe in God.

213. **The Teenager.** *Frisco*: Amy Morrison, 15, a patient. *The Holdovers*:

Angus Tully, 15 (17 in the Awards Draft), a student. A precocious, neglected teenager who is eligible to go home but remains at the institution due to a troubled relationship with the neglectful mother figure, and so comes into Willis/Paul's particular charge, first as his patient or as one of his holdovers, and then as his sole charge (Beats 4–5).

214. Amy/Angus has a dead or ostensibly dead father, a step-parent defined by money, and a history of having to leave institutions: the hospice that "had issues with" Amy (Fr. 7), the schools Angus has been "kicked out of" (Aw. 31). Early in Act 1, we learn that each steals from the other children at their institution: Amy steals chocolate from the little kids, Angus steals cigarettes from another boy.

215. A quick and irreverent wit hides their own psychic pain; in their first exchange with Willis/Paul they call him, or his plan, "depressingly square" (Fr. 9) or "a little absurd" (Aw. 11). Their sensitive side is nonetheless shown when Willis/Paul discovers them missing and finds them listening to poetry (Fr. 58) or playing the piano (Aw. 70). Neither appears to have a friend beyond the sixteen-year-old love interest they meet at the event in Act 2: Angus says "I don't have any friends" (Aw. 91), and Amy's funeral is attended only by "Willis, Susie, Anne, Melcher, a couple of Nurses, a few others" (Fr. 111).

216. Each has a significant health concern: Amy a brain tumor, and Angus a condition which requires him to take Librium. They conceal it sufficiently such that other characters, Danny (Amy's love interest) and Paul, learn of it only at a hotel breakfast late in the trip (Fr. 95; Aw. 85). In a vulnerable moment Amy/Angus confess their fear about it to Willis/Paul, Amy asking "is this what dying is like?" (Fr. 45–46), Angus saying he is "afraid that's what's going to happen to me one day [i.e., that he will lose his mind like his dad]." (Aw. 91). In each, the fear is specifically of a fate they have already watched a parent meet: Amy's parents are both dead; Angus's father is in an asylum.

217. **The Companion.** *Frisco*: Valerie, early thirties, a drug representative

at the conference. *The Holdovers*: Mary Lamb, the school cook. A woman who works in a field related to Willis/Paul's, in a less prestigious capacity, joins the pair on the trip to the city. Her friendship with Willis/Paul is established in three beats in the same order. The first is a scene that establishes that, because of their work, they will be in the same place together for some time—the conference or the school—and closes with an agreement to share a cab or drink. The second is Willis/Paul's defense of her against a teenager who is rude about her job, with a figurative put-down. The third encounter follows three scenes of Willis/Paul moving through his current workplace, the conference hall or the school's hallways, before he sees her at a distance or hears the television program she is watching (Fr. 54–56; Aw. 25–26). The scene itself is then built around her cynical explanation of her product or TV show to him, which includes a comically modest gift or prize, "branded laser pens" / "Weber barbecue and picnic utensils" (Fr. 56; Aw. 26). Once the friendship has been established, Valerie/Mary serves as an adult sounding board for Willis/Paul and encourages him to go easier on Amy/Angus, notably helping persuade him to take Amy/Angus into the city or to its sights (Beat 16; Fr. 80; Aw. 72).

218. **The Unrequited Love.** *Frisco*: Susie, Willis' separated wife, "late 40s," a hospital social worker. *The Holdovers*: Miss Crane, "middle-aged," the headmaster's secretary. A colleague in her forties on whom Willis/Paul has improbable romantic designs. The strand plays five beats in the same order: Susie/Ms. Crane is first met at the door of Willis/Paul's modest quarters, the first principal character we meet after him (Fr. 4; Aw. 2); she gives Willis/Paul a small kindness, a coffee (Fr. 15) or a party invitation (Aw. 49), misread as an overture; his specialty is misstated by her and corrected by him, "peanuts" / "hazelnuts" (Fr. 37), "History, right?" / "Ancient Civilizations, yes" (Aw. 59); at the event, his hope raised and then dashed in two stages, as detailed above (Beat 13); and an Act 3 encounter closes the strand without rancor, Susie telling Willis the marriage is over and Willis accepting it (Fr. 101–103), Paul wishing Miss Crane a happy new year

and thanking her for the party (Aw. 98).

219. **The Boss.** *Frisco*: Margaret Brown, hospital manager. *The Holdovers*: Dr. Hardy Woodrup, headmaster. Willis/Paul's direct supervisor, who runs the institution but answers to an unseen board, appears in substance only at the start, to reprimand him, and again at the end, to orchestrate the encounter with the aggrieved parents. The Boss relates to Willis/Paul less as an underperforming subordinate than as an exasperating colleague who has finally exhausted the patience he feels entitled to try: "Come on, Margaret" / "Come on, Hardy."

220. The remaining roles are one-scene or near-one-scene characters whose match is of function and placement:

| Role and function | *Frisco* | *The Holdovers* |
|---|---|---|
| **Confidant Colleague.** The colleague Willis/Paul confides in, drinks with and discusses marriage with at work; in *Frisco* appears only in Act 1 and Act 3. | Ron Melcher, pathologist; beer from the mortuary fridge (Fr. 18–20, 105–106) | Mary Lamb again; bourbon in kitchen mugs (Aw. 20–22, 26–28, 35–37, 103–104) |
| **Neglectful Mother.** More concerned with appearing a good parent than being one. The reason Amy/Angus stays at the institution; the subsequent failed phone call strands the pair (Beat 5); absent from Act 2; reappears in | Anne Morrison, stepmother (Fr. 8, 33, 43, 112) | Judy Clotfelter, mother (Aw. 15, 34, 99) |

| Role and function | *Frisco* | *The Holdovers* |
|---|---|---|
| Act 3 (Fr. 111–112; Aw. 99–102). | | |
| **Step-parent.** Defined by Amy/Angus in financial terms, in the same construction. | Anne Morrison (Fr. 8) | Stanley Clotfelter (Aw. 15, 67, 99) |
| **Aggrieved Parents.** Present at the second boss meeting; Willis/Paul is expected to placate them and does not (Beat 22). | The Lakovics (Fr. 114–115) | Judy and Stanley Clotfelter (Aw. 99–102) |
| **Teenager's Love Interest.** Sixteen; present at the event (Beat 12); Amy/Angus's romantic first. Willis/Paul disparages the romance. | Danny, "about sixteen" (Fr. 70, 91–93, 96) | Elise, 16, Miss Crane's niece (Aw. 58–60, 62, 67) |
| **Handsome Man.** Watched greeting or parting from a woman while Willis/Paul drinks whisky. | Handsome Man, hotel bar/billboard (Fr. 65) | Handsome Man, party (Aw. 65) |
| **Successful Double.** A man Willis/Paul | The same Handsome Man, the billboard actor | Hugh Cavanaugh, with Karen (Aw. 79–81) |

| Role and function | *Frisco* | *The Holdovers* |
|---|---|---|
| recognizes when he runs into him in the city: a peer seen in person in only one scene, with women or a wife, who embodies the personal and professional success Willis/Paul lack. | (Fr. 5, 65–67) | |
| **Other Children in Willis/Paul's Charge.** Bookend Willis/Paul's working life, speaking in his first and clinic scenes | Clive (Fr. 1–3, 117) | Kountze (Aw. 10–12, 97) |

**C. Pace.**

221. Whether beats fall on the same day or across a week, their order on specific story days, and where a story skips days are specific choices made by the writer of a screenplay. *Frisco* and *The Holdovers* repeatedly make identical ones.

222. Both works move through many of the same events at the same rate. By page, the twenty-four shared elements discussed above and depicted in Exhibit G at Table 25 (p. 33) fall in the same order and at broadly similar positions in each script. The pace is therefore similar.

223. However, another measure shows a more striking similarity: by story day, the works run in daily step from just before Willis/Paul and Amy/Angus are thrown together until the celebratory meal. Counting each work's opening as Day 1, the two fall into step on Day 4 and remain in step for four story days, some forty pages of *Frisco* and thirty-six pages of *The Holdovers* (Fr. 34–73; Aw. 29–64). How

each work's days are fixed, by title cards in *The Holdovers* and by scene headings, commutes and dialogue in *Frisco*, is set out in Exhibit G at Table 26 (p. 34), and summarized below.

| | *Frisco* day (pp.) | *The Holdovers* day · card (pp.) |
|---|---|---|
| Set-up | Days 1–3 (1–29) | Day 1 · Dec 18 (1–28) |
| Amy/Angus speaks of getting away from the institution | Day 4 (34) | Day 4 · Dec 21 (29) |
| Calls to the parent fail; the man/teenager pair are left together (Beats 4–5) | Day 5 (40–43) | Day 5 · Dec 22 (33–35) |
| The hotel day: the booking, the argument, the emergency, the hospital, "Dad", the bar (Beats 6–9) | Day 6 (51–65) | Day 6 · Dec 23 (38-48) |
| The event day: the request, getting ready, the event, Willis/Paul's disillusion (Beats 10–13) | Day 7 (67–73) | Day 7 · Dec 24 (54–64) |
| The city: the meal, the outings, the slip-away, the journey home (Beats 15–20) | Day 7 evening – Day 8 (75–102) | Days 8, 10–12 · Dec 25, 27–29 (Day 9 cut; Day 12 uncarded) (71–95) |

| | *Frisco* day (pp.) | *The Holdovers* day · card (pp.) |
|---|---|---|
| Back at work; the ward; Amy dies | Days 9–10 (103–110) | — |
| First jump: through a set-piece to Willis/Paul back at the institution; the stand-off before the parents | The funeral; the bridge, the billboard changed (111–117) | New Year's Eve, uncarded (95–96; a single cut to Jan 11 in the May 2021 draft); New Semester · Jan 11 (96–102) |
| Second jump: the departure in a changed vehicle | The RV in the garage (117–118) | DISSOLVE to the emptied room; the U-Haul (103–107) |

224. *Frisco*'s fifth day sees the pair stuck together and the sixth day sees them in San Francisco for the conference; *The Holdovers*' are December 22 and 23 at the school. Nothing in the calendar requires the two become stuck together on the fifth story day, nor that an emergency share a day with the hotel booking and the argument; *The Holdovers* could have spread those events over its weeks of Christmas break, and instead placed them exactly where *Frisco* places them. The two works diverge when the celebratory meal takes place on Day 7 in *Frisco* but Day 8 in *The Holdovers*.

225. Each work's third act then jumps forward twice, at the same points. The first jump follows the rule-breaking beat (Fr. 110–111; Aw. 95–96) and lands, in *Frisco* after Amy's funeral, on Willis/Paul back at the institution (Fr. 113–114; Aw. 96–98).The second jump follows the parents' meeting, in *Frisco*, after the reprise montage and the clinic coda, and lands on the departure in a changed vehicle

(Beat 24). (As detailed above in Section F.3(A), credited screenwriter David Hemingson has described the day cards as "temporal mile markers throughout the script."[50]

**D. Dialogue**

226. *The Holdovers* is not alleged to reproduce *Frisco*'s dialogue verbatim. What is alleged, beyond a notably shared register, is two things: first, at numerous pivotal points corresponding sequences of exchanges move the drama the same way; and second, in a number of key places the same rhetorical device is deployed at the same moment to the same effect. Both of those uses of dialogue are the essence of a writer's execution, not idea.

**1. The exchanges.**

227. Five such scenes, each falling within the sequence, have already been set out under Plot: fifteen matched beats in the "First Boss Meeting" (Exhibit G at Table 17 (p. 5-8); Beat 3); fourteen in the "Caretaking Argument" (Exhibit G at Table 18 (p. 9-16); Beats 4-17); six in the "Request to Attend the Event" (Exhibit G at Table 20 (p. 19-24); Beats 1–6; Beat 10); eleven in the "Ask to See the City" (Exhibit G at Table 21 (p. 25-26); Beat 16); and fifteen in the "Second Boss Meeting" (Exhibit G at Table 22 (p. 27-29); Beat 22).

228. Several fall slightly out of sequence so were not described above in "Sequence of Events." Three of those are set out here. (Exhibit G at Summary of Tables 27-29 (p. 35).).

229. **The minor and the alcohol.** In both works, on the final night of the trip to the city, the group has to leave an establishment after Willis/Paul's attempt to order a memorably named drink or dessert for Amy/Angus leads to a confrontation with a staff member. The scene runs through sixteen matched beats (Exhibit G at Table 27 (p. 36-39)):

[50] WGF.

(a) **An alcoholic item is introduced, but its description leaves out the alcohol.** In *Frisco*, Amy proposes "jaegerbombs"; in *The Holdovers*, a waiter sets fire to a chafing dish. Willis: "What's a jaegerbomb?" Amy: "Root beer and coke. You know, what little kids drink?" Angus: "What's that?" The waitress: "That's our signature dessert. Cherries jubilee."

(b) **"Sounds great."** Valerie: "Sounds great." Angus: "That sounds great." Neither script uses the phrase anywhere else.

(c) **The man orders the alcoholic item for the minor.** Willis: "Two jaegerbombs and two whiskey sours please." Paul: "Bring the young vandal here cherries jubilee."

(d) **The staff object, and he tries to get round the rule.** In *Frisco*, a bouncer says "You've been giving alcohol to minors"; in *The Holdovers*, the waitress says "It's still against the rules." Willis: "They're just root beer and coke." Paul: "I'll order the cherries jubilee. We can share it." In both, the staff insist against giving the alcoholic items to Amy/Angus.

(e) **As they leave, his disapproval softens, and outside they stand together looking at a light against the dark.** Willis "starts to smile too but quickly looks away"; the four stand in a line on Nob Hill, staring "in wonder" at "the night-time lights of the city." Paul: "I don't approve, but good thinking," then "Presto! Cherries jubilee!" as the three stand gazing at the flaming takeout container (Film 1:52:34). (Fr. 82–86; Aw. 92–95.)

230. **The "not in here" rule.** Back home or back at the school, a "not in here" rule is stated, and Willis/Paul breaks it in five matched steps, the scene ending with the camera outside the room. (Exhibit G at Table 28 (p. 40-41).)

(a) **The rule is stated, around the same two words: "in here."** In

*Frisco*, Willis' daughter Alexis tells Willis: "You shouldn't be in here before eight-fifteen!" In *The Holdovers*, Paul tells Angus: "You're not deploying that in here."

(b) **He moves to the kitchen.** In *Frisco*, Willis "walks straight past them all, through to the kitchen"; in *The Holdovers*, "They head to the adjacent kitchen area."

(c) **He commits the infraction himself.** Willis "takes a BEER out of the fridge opens it and pours it into a glass"; Paul "gives the M-80 to Angus and lights it for him."

(d) **The infraction is completed.** Willis "walks into the guest room carrying his two beers"; Angus "throws it off-screen. LOUD EXPLOSION."

(e) **The scene ends with the camera outside the room.** In *Frisco*, Willis "closes the door behind him"; in *The Holdovers*, "Through the windows we see the threesome hugging one another." (Fr. 110–111; Aw. 95–96; Film 1:54:10.)

231. **The Farewell.** Six matched beats in sequence **(**Exhibit G at Table 29 (p. 42-44).**):**

**(a) The mother figure is mentioned.** Willis: "Do you want me to call Anne?" Angus: "I don't know what you said to my mom and Stanley and Woodrup."

**(b) Willis/Paul's dismissal is mentioned**. Amy: "I'm pretty sure I fired you." Angus: "And you got fired." (In *Frisco* Amy has dismissed him as her doctor; in *The Holdovers* the school has dismissed him.)

**(c) The time together is recalled through a trivial detail introduced with "you know."** Willis thanks Amy for "paying for the hotel suite"; Angus proposes they "head over to the Winning Ticket,

grab a burger and a beer."

(d) **He offers a last word of support.** Willis: "Is there anything I can do?" Paul: "Keep your head up, all right? You can do this."

**(e) Amy/Angus's reply is understated.**. Amy: "You could read to me, Jeff." Angus: "I was gonna tell you the same thing."

**(f) His last words go unheard as Amy/Angus leaves his life**. Willis reads to Amy as her eyes close. Paul's "See 'ya" comes, in the Film, thirteen seconds after Angus's, when the boy is far up the path and out of earshot. (Fr. 108–110; Aw. 105–106; Film 2:07:34, 2:07:47.)

**2. Matched rhetorical devices.**

232. The use of specific rhetorical devices in specific contexts is the essence of a writer's artistry. *The Holdovers* frequently employs the devices *Frisco* uses in near-identical ways to advance the same character and plot beats as *Frisco*. Two of the devices listed below—the anaphora and the Parthian shot—appear in *The Holdovers* without the set-up that motivates them in *Frisco*.

233. **The check-in lie, ending on "Dad" (Tag Question).** At a check-in—the hotel in *Frisco*, the ER in *The Holdovers*—Amy/Angus rescues Willis/Paul from a difficulty of the Teenager's own making by lying to the official, casting Willis/Paul as their parent and their mother, Anne/Judy, as his wife or former wife. Both works build the lie from the same five moves in the same order, culminating in a tag question, a question that presumes the listener's assent (nine matched beats, Exhibit G at Table 19 (p. 17-18); *id*. at Table 30 (p. 45).):

(a) **Amy/Angus takes over.** Amy: "We'll take it." Angus: "Is there any way we could skip this whole insurance thing?"

(b) **Willis/Paul is described to the official as "my dad."** Amy: "Private joke between me and my dad." Angus: "I never get to see my dad."

(c) **The mother is described as the man's wife or former wife.** Amy: "Anne's my mom. His wife." Angus: "I don't want her dragging you to court again." In *The Holdovers* the mother is invoked twice: before "my dad," as divorced from him, and after it, as the woman who took him to court.

(d) **Amy/Angus turns to him with a tag question that presumes his assent.** Amy: "She's just a crazy shopaholic, hey Dad?" Angus: "We can pay cash. Right, Dad?"

(e) **That question ends the scene,** so he has no chance to refuse the role, and "Dad" is its last word, underscoring its importance. (Fr. 51–52; Aw. 43–44; Film 0:52:09–0:52:48; Exhibit G at Table 19 (p. 17-18); *id*. at Table 30 (p. 45).)

234. **The ask to see the city (Anaphora).** At the same point in each story (Beat 16), Amy/Angus voices the wish to see the city in an anaphora, three clauses on one repeated opening. *Frisco*: "What about the Golden Gate Bridge? What about the steep hills? What about the sea lions?" (Fr. 80). *The Holdovers*: "I want a real Christmas. I want to go ice skating. I want to see a real Christmas tree with ornaments" (Aw. 72). In *Frisco* the figure is a callback: earlier, Amy listed the same sights in four clauses on "I'm going to" (Fr. 53). *The Holdovers* has no earlier instance for its list to call back to; it keeps the device without the moment that prepares it. (Exhibit G at Table 31 (p.45).)

235. **The parting medical jibe (Parthian Shot).** Each meeting with the aggrieved parents ends on the man's parting insult, a Parthian shot, and in each, it has a medical basis. *Frisco*: Willis answers "Maybe Jenna can" (Fr. 115), suggesting that a woman who recommended "herbal vaccination" (Fr. 25) should take over his allergy job. *The Holdovers*: Paul tells Woodrup he is "penis cancer in human form" (Aw. 102). *Frisco*'s line is a callback, paying off Jenna's herbal vaccination from Act 1, and a medical jibe suits a doctor. In *The Holdovers* nothing prepares it, and a

teacher of ancient civilizations reaches for a medical insult. (Beat 22(h); Exhibit G at Table 32 (p. 46).)

236. **The step-parent reduced to money (Tapinosis).** Willis/Paul assumes a living parent; Amy/Angus replies that the parent is dead; Willis/Paul questions it; and Amy/Angus identifies the step-parent and dismisses that person with the word "just" and a line that reduces them to money. This is a tapinosis, or belittling description, and Amy/Angus uses not just the same device but the same construction: *Frisco*: "My mom's dead." ... "just the woman that is going to inherit my trust fund" (Fr. 8). *The Holdovers*: "My father's dead." ... "just some rich guy my mom married" (Aw. 67; Film 1:16:44; Exhibit G at Table 33 (p. 46).)

237. **The put-down in the Companion's defense (Double Meaning and Simile).** When a teenager is rude about the Companion's work, Willis/Paul defends her not with a rebuke but with a figure of speech, and it closes the scene. *Frisco*: a double meaning, "I have a severe pain in the neck" (Fr. 50). *The Holdovers*: a coarse simile, "life is like a henhouse ladder -- shitty and short" (Aw. 25). (Exhibit G at Table 34 (p. 47).)

238. **The verdict on his barb (Diacope).** When Willis/Paul lands a cutting reply, Amy/Angus concedes the hit in a diacope, a word repeated after a brief interruption, here a form of address, the over-familiar "Jeff" and the over-deferential "sir" doing the same work. *Frisco*: Willis: "Well, you should have thought about that before you broke curfew." Amy: "Harsh, Jeff. Very harsh" (Fr. 60). *The Holdovers*: Paul: "Too bad everyone dislikes you. Pretty much hates you." Angus: "Touché, sir. Touché" (Aw. 86; Exhibit G at Table 35 (p. 48).)

**3. Shorter matched exchanges.**

239. Beyond the level of scenes and rhetorical devices, numerous short exchanges built from the same moves in the same order advance plot and character in identical ways.

240. **Amy/Angus as Willis/Paul's romantic adviser.** Amy/Angus points

out a romantic possibility to Willis/Paul: Amy tells Willis that Valerie likes him (Fr. 74); Angus tells Paul that he and Miss Crane "have chemistry" (Aw. 47–48). It is then pushed further: Amy/Angus proposes that he have sex with a woman who has just left the scene; he appeals to principle, Willis: "I'm married. I made a vow. That doesn't mean much at your age" (Fr. 77) / Paul: "Call me old-fashioned, but I place value on physical intimacy" (Aw. 77); Amy/Angus bluntly challenges his actual sex life, "She makes you sleep in the garage!" / "You've never had sex, have you?"; and he retreats to a claim of hidden depth, Willis: "Our love is more complicated than you could ever understand" / Paul: "there was a time when the fire in my loins burned white hot" (Fr. 77; Aw. 77; Film 1:28:54; Exhibit G at Table 36 (p. 48-49).).

241. **The doctor cut off.** Willis/Paul begins a measured description of a colleague with the title of doctor, breaks off or is cut off mid-sentence, and a woman or girl completes it with a coarse epithet, a bathos from the measured to the vulgar. *Frisco*: Willis: "Dr Turner is a very good physician. She is a Stanford graduate and"; Amy: "She's a mewling quim" (Fr. 28). *The Holdovers*: Paul: "Dr. Woodrup is, how can I put this—"; Miss Crane: "A pompous ass with a dictator complex" (Aw. 48; Exhibit G at Table 37 (p. 50).).

242. **The leverage.** Willis/Paul's job hangs on one more complaint, and Amy/Angus turns that into leverage over him to get something that keeps them together.

(a) **The hold is made explicit.** Amy: "Maybe I'll get her to complain if you don't share." Angus: "Oui, monsieur. Now you owe me."

(b) **He resists.** "Willis is still looking hesitant." Paul: "Do not try to leverage me, Mr. Tully."

(c) **The ask is made to sound small.** Amy: "I absolutely promise you it is not going to be awkward... We don't even have to talk to one another." Angus: "All I'm looking for is little thank you that I did something nice for you."

(d) **He gives way, and the next scene has them spending more time together:** sharing his berth on the train; at the tavern. (Fr. 25, 28–29, 44; Aw. 42–46; Exhibit G at Table 38 (p. 51-52).)

243. **The medication excuse.** Amy/Angus says something indiscreet about sex or romance; Willis/Paul puts it down to medication; and Amy/Angus rejects the excuse and presses the point. Amy: "I really want to have sex with a boy... But time is short so I'd probably settle." Willis: "Amy is on medication. It makes her loopy." Amy: "I'm only on Tylenol. It doesn't make me loopy" (Fr. 31). Angus: "You two have chemistry" (*see* above). Paul: "That's the Percodan talking." Angus: "Seeing her like this, I think she's pretty attractive" (Aw. 48; Exhibit G at Table 39 (p. 53).).

244. **"No wonder."** A "how long" question confirms a lasting condition; the man assents; Amy/Angus answers with a "no wonder" that ties it to his failure with women; and he is stung. Amy: "You've been too busy to have fun since nineteen ninety-eight?" Willis: "Yeah." ... Amy: "Then it's **no wonder** your wife wants a divorce." Willis: "What?" (Fr. 61–62). Angus: "Wow. Your whole life?" Paul nods. Angus: "**No wonder** you're afraid of women." Paul, stung: "I am not afraid of women. Jesus" (Aw. 53; Exhibit G at Table 40 (p. 53).).

**E. Theme.**

245. The central theme of both works is youthful vitality set against weary adult cynicism: the risk that vitality is lost in adulthood, and the possibility of recovering it. In *Frisco*, Willis puts it to a young patient: "Right now, you have a twinkle in your eye. You don't know it is there… when I bring my grandchildren in to see you in thirty years' time, I want it to still be there" (Fr. 117). In *The Holdovers*, Elise (Angus' love interest) expresses the same idea by quoting Picasso: "every child is an artist. The problem is remaining an artist when we grow up" (Aw. 60; Exhibit G at Table 41 (p. 54).).

246. As *The Holdovers*' Picasso quote shows, the broad theme in isolation is an unprotectable idea. What is claimed here are the precisely matched devices

through which both works express this theme.

247. **The stopped life and the abandoned child.** Each work sets the theme up through the two specific contrasting characters delineated above and the relationship that unfolds through the same beats (*see* Characters, the Man and the Teenager). (Exhibit G at Table 42 (p. 54).)

248. **The shared interest and the forgotten dream.** Willis/Paul shares a niche historical interest with Amy/Angus: the Beat Generation in *Frisco*, ancient history in *The Holdovers*. The interest is established at their first encounter. Willis picks up Amy's copy of *On the Road* ("You like Kerouac?", Fr. 9); Angus earns a B+ in Paul's class while his classmates receive Cs, Ds and Fs (Aw. 10). Later Amy/Angus knows enough to challenge Willis/Paul: Amy corrects Willis's misattribution of "Howl" to Kerouac (Fr. 24); Angus answers Paul's warning about crossing the Rubicon with "Alea jacta est" (Aw. 41; Exhibit G at Table 43 (p.55-56).)

249. Willis/Paul has an unfulfilled youthful ambition rooted in the shared interest, dating from his youth and requiring travel for a specific purpose. Willis wanted to "drive across America… Find the pearl,"[51] but instead "went to college"; Paul hopes to go to Carthage to finish a monograph he began "in college" (Fr. 9; Aw. 37). The exchange that establishes this runs through the same five moves in both, from a tangential question to a scolding, in *Frisco*: "How depressingly square" (Fr. 9) / in *The Holdovers*: "You can't even have a whole dream, can you?" (Aw. 37; Film 0:45:03); the listener is Amy in one work and Mary in the other. (Exhibit G at Table 44 (p. 57-58.).

250. In the second half of Act 2, the characters visit a place tied to the

[51] Willis is here referencing a recurring motif in Jack Kerouac's classic Beat-generation novel, On the Road ,which introduces it thus: "Somewhere along the line I knew there'd be girls, visions, everything; somewhere along the line the pearl would be handed to me."

shared interest and bicker there: in *Frisco*, the Sixth Gallery, "where Allen Ginsberg first performed 'Howl'" (Fr. 81–82); in *The Holdovers*, the Greek galleries of the Museum of Fine Arts (Aw. 77–78). Late in both works, a book recalls the interest: the copy of *On the Road* from which Willis reads to Amy (Fr. 109); the copies of *Meditations* Paul gives away and keeps, seen as Paul packs (Aw. 70, 103).

251. The man's long-lost dream supplies each work's ending: Willis/Paul's tentative announcement that he may now pursue it, and the drive away (Beats 23–24).

252. **The untenably low standing at work.** Both works measure Willis/Paul's untenably low standing at his institution with the same two devices, each used in the same way. (Exhibit G at Table 45 (p. 59-60.).

253. The first device is an object that shows his work going unrewarded while others are honored: in *Frisco* the billboard that advertised the hospital but featured the Handsome Man in Willis's place (Fr. 5); in *The Holdovers*, the cognac the Board of Trustees gifted the headmaster, even though Paul is the one stuck there over the holidays (Aw. 6). In each, the object returns as he leaves with its meaning reversed: the billboard now carries an advertisement featuring a pearl, the object of the dream Willis abandoned ("Find the pearl," Fr. 9, 118); Paul takes the headmaster's cognac with him, swigs it and spits it out the window (Aw. 106).

254. The second device is a successful double: a peer whom Willis/Paul recognizes on encountering him in the city, who appears in only one scene, with a wife or women beside him, and who has the professional and personal success Willis/Paul lacks. In *Frisco*, he is the billboard actor himself, met in the hotel bar (Fr. 65–67); in *The Holdovers*, he is Hugh Cavanaugh, Paul's former classmate, met in Boston (Aw. 79–81). In each, the encounter is set up to wound Willis/Paul, but the tables are turned: the billboard actor confesses he is as unhappy as Willis, and Paul, with Angus's help, leaves Hugh believing he has landed on his feet (*see* Characters, the Successful Double). Each work also states the man's standing in

terms of his perceived low pay: In *Frisco*, "Bill Drake's job rewards him with actual money" (Fr. 106); in *The Holdovers*, "zero respect and even less pay" (Aw. 83).

255. **The way the relationship changes Willis/Paul.** Willis/Paul's new regard for the teenager is made explicit in a speech made in the presence of the adults who have failed that child—including the neglectful mother figure—in the same three elements, differently ordered: he acknowledges the teen's difficult temperament: in *Frisco,* Amy "took absolutely no shit from anybody"; in *The Holdovers*, "He's a pain in the ass, sure". The man stresses how short a time the two have spent together: Willis on Amy: "even though I only knew her for a short time" / Paul on Angus: "I just spent two solid weeks with him". And he insists on the teen's worth and potential that has been or risks being wasted—Willis says Amy "would have made more of even one more week of life than any of us in this room have done in years" (Fr. 112); Paul describes Angus as "also really smart" with "enormous potential," so that removing him from the school "would be devastating" (Aw. 102).

256. The change in the Man is likewise shown through three matched choices. First, he enjoys himself with Amy/Angus in a way unimaginable at the start (Beat 18). Second, back home or back at the school he openly breaks a "not in here" rule. Third, having learned from the child's defiance, he defies the boss and the institution to which he grudgingly acquiesced at the start, by refusing to placate a pair of aggrieved parents.

257. **The bittersweet conclusion.** Willis/Paul's predicament is resolved and he is set free to follow his dream; Amy/Angus's situation is less fully repaired. Each gets the wish pursued in the city, Amy's is a romantic one and Angus's wish is to see his father, yet Amy dies (Fr. 110), and Angus still has the Librium, an institutionalized father, a neglectful mother and stepfather who wanted him sent away (Aw. 85, 101). The imperfect ending is the theme's last word: the child's vitality is what the adult has recovered, and it is the child who may not get to keep

it.

**F. Mood.**

258. The two works share an unusually poignant and bittersweet tone, and in both, the primary cause is the same: beneath the sparky verbal interplay between Willis/Paul and Amy/Angus, each story is overshadowed by the recent or impending death of a young person. In *Frisco* we learn by page 9 that fifteen-year-old Amy is dying ("Tell me about [sic]. I'm dying too"); in *The Holdovers,* we learn on page 12 that Curtis Lamb, Mary's son, recently died at nineteen, the chapel's opening close-ups ending on "a portrait of CURTIS EZRA LAMB... with a plaque bearing the dates 1951-1970" (Aw. 12). Neither work foregrounds the young person's death; instead, each returns to it throughout the narrative: Amy's fear on the train (Fr. 45–46), her vomiting (Fr. 40, 95), her end (Fr. 109–110); Curtis in the chapel service (Aw. 13–14); the box of baby clothes Mary carries to her sister's (Aw. 57, 75), the sister's baby to be given Curtis's name (Aw. 104).

259. Two other elements make the deaths a close match. Curtis is introduced in the end-of-term service, but *The Holdovers* stages it like a funeral, and particularly as *Frisco* stages Amy's funeral: the portrait or photograph at the front, a clergyman who concedes the congregation's impatience, "This first song is at least a short one" / "I know you're all anxious to start the holidays," a short tribute to the dead teenager, and a grieving mother figure in the congregation (Fr. 111–112; Aw. 12–14; Exhibit G at Table 47 (p. 62).).

260. In both works, the death brings tears on a single occasion, by the same mechanism: anachronistic music the dead teenager chose or loved is played in company; the choice draws a reservation or an objection, the minister's "I'm not sure it is what any of us would have chosen" / a guest's "something a little hipper"; and the character who has kept a composed face through the story breaks, Willis "openly weeping, the first time in years" at the second song of Amy's funeral (Fr. 111–113), Mary sobbing "He's gone" in the kitchen after the Artie Shaw record

(Aw. 64–66). Despite the matched event, the griever and place in the story differ, so it is pleaded as a contribution to mood and not to story. (Exhibit G at Table 48 (p. 63).).

261. Beneath that long shadow, both works are comedies. Willis/Paul's humor is verbal, educated and cynical, and it is answered in kind by Amy/Angus, who gives as good as she or he gets and whose own wit is sharp (*see* Characters). The two leads nonetheless also carry a matching sadness, Willis/Paul weary and resigned, Amy/Angus neglected and facing an uncertain future, and it surfaces at the same moments in both (Beats 5, 13).

262. **The trajectory.** The mood moves in step. Both begin with institutional images, downbeat ones among them, with neither lead in frame, and Act 1 continues through isolation and resignation; the sparring lifts the first half of Act 2, with a tense interruption at the emergency, and the second half, from the celebratory meal through the city, is the most cheerful stretch of each work (Beats 15–19). The return is deliberately anticlimactic, Willis/Paul back at work with nothing seeming to have changed (Beat 21). The mood then crashes as Amy's condition worsens (Fr. 104–110) and Angus and Paul face a serious confrontation (Aw. 98–100). Here the trajectories briefly diverge because the two works play the same two beats in reverse order, *Frisco* the restrained farewell and then the ratcheting tension of the ultimately cathartic confrontation with the boss (Fr. 108–110, 114–115), *The Holdovers* the confrontation and then the farewell (Aw. 99–102, 105–106). Both then close on the same note as Willis/Paul takes to the road (Beat 24): satisfaction, a light-hearted moment with the symbolic object, and optimism about a journey finally begun.

263. **The images that carry the mood.** The Ninth Circuit has recognized the contribution of imagery to the mood of a screenplay (*Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990)). The key images of *The Holdovers* match images written into *Frisco*, at the same moments, to the same effect.

| Moment and effect | *Frisco* | *The Holdovers* |
|---|---|---|
| Opening montage of the institution, downbeat in its images of decline, with neither lead in frame; in Act 3 a second institutional montage, again without the leads until its last shot, ends on Willis/Paul at work | "abandoned gurneys," a "faded sign," a "decapitated teddy bear" (Fr. 1); the empty waiting room, the plaster room and the nursery under Willis's voice-over, ending in his clinic (Fr. 115–116; Exhibit G at Table 46 (p. 61) | A "New England town in decline," a "shuttered textile mill," a "frigid campus" (Aw. 1); the quad, weight room and gym, ending in Paul's classroom (Aw. 96–97);; Exhibit G at Table 46 (p. 61) |
| Willis/Paul in a public place, a uniformed figure beside him, Amy/Angus framed at a distance with the opposite sex (Beat 18) | "a UNIFORMED POLICE OFFICER is interviewing Willis [a]nd Valerie. A window gives on to corridor, where Amy and Danny are sitting"; through the window they "have started kissing" (Fr. 90–91) | "In the distance, Angus now bowls with the girls... Drinking and smoking a few barstools away is a gin-blossomed SANTA chatting with the BARTENDER" (Aw. 86) |
| Late Act 2 tableau of the group's bonding, at the close of the alcohol sequence: the group together against the dark, with a light before them | The four "stood in a line. Spread out beneath them are the night-time lights of the city," at which they stare (Fr. 85) | The script cuts WIDE to the three around the flaming container (Aw. 94–95); the Film holds the shot, the three close together in the dark lot, lit by the fire (Film 1:52:34) |
| Willis/Paul's "not in | Willis closes the guest- | The three are seen through |

| Moment and effect | *Frisco* | *The Holdovers* |
|---|---|---|
| here" rule-breaking, seen from outside the room | room door on his family, and the scene ends outside the room where the rule-breaking is completed (Fr. 111) | the window, from outside, after the M-80 goes off (Aw. 96; Film 1:54:10) |
| Willis/Paul's last words to Amy/Angus as they leave his life | Willis reads aloud; Amy closes her eyes as he reads (Fr. 109–110) | Paul says "See 'ya" as Angus runs into the distance (Aw. 106), delivered thirteen seconds after Angus's, once he is far away (Film 2:07:34, 2:07:47) |

G. **Setting.**

264. What the works share is a set of corresponding locations, each hosting the corresponding event. At the institution that hosts Acts 1 and 3: the boss's meeting room or office, scene of both meetings (Beats 3, 22); the staff dining room in which he sits alone, or his chair is empty (Beat 3); the hospital balcony or school quad where the teenager smokes; and the ward or classroom where he is seen back at work in his first-scene clothes (Beat 21). In the city: an attraction peculiar to the city, the Pier 39 sea lions or a candlepin bowling alley, where the fun reaches its height (Beat 18); a place tied to the shared interest, the Sixth Gallery or the Museum of Fine Arts (Beat 17); and a nightclub or restaurant the group must leave after the alcohol incident. Where *The Holdovers* stays at the school longer, its locations do the same work: an emergency room near the school, a school corridor for a San Francisco street, a hospital admissions desk for a hotel reception, and the school

auditorium, where Paul finds Angus at the piano, for the bookstore where Willis finds Amy enraptured by a poetry reading. (Exhibit G at Table 49 (p. 64).).

**H. Selection and Arrangement.**

265. Copyright protects the selection and arrangement of elements that are individually unprotectable, where the combination is numerous enough to be an expressive choice and the combination itself is what was taken (*Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002)). Stephenson pleads that claim in addition to, and in the alternative to, the claims above: the twenty-four elements of Exhibit G, the scenes set out in Tables 16-49, and the characters who carry them, selected and arranged into the same sequence and, through the middle of each work, onto the same story days. The emergency illustrates the point. A teenager in a man's care is hurt and taken to hospital in many stories; the argument about the man's authority, the dramatic irony and lofty pronouncement that precedes the collapse, the episode that looks grave and proves manageable, the same-evening discharge, the woozy comic demand, the man's whisky that evening, and the single story day on which all of it falls, the sixth in each work, are choices, and *The Holdovers* makes every one of *Frisco*'s in *Frisco*'s order.

**<u>FIRST CLAIM FOR RELIEF</u>**

**(Copyright Infringement against all Defendants)**

266. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as though fully set forth herein.

267. Plaintiff Simon Stephenson is the owner of a valid copyright in the original screenplay *Frisco*, including the registered work identified by Copyright Registration Nos. PAU004214821 and TXu 2-566-622.

268. *Frisco* is an original work of authorship fixed in a tangible medium of expression and protected under the Copyright Act, 17 U.S.C. §§ 101 et seq.

269. Plaintiff owns the exclusive rights set forth in 17 U.S.C. § 106, including the exclusive rights to reproduce, prepare derivative works from,

distribute, publicly perform, publicly display, license, and otherwise exploit *Frisco*.

270. Defendants had access to *Frisco* as alleged herein.

271. Defendants copied protected expression from *Frisco* and adapted it into successive drafts of *The Holdovers*, the completed screenplay, the motion picture, and other derivative materials as alleged herein

272. Each draft of *The Holdovers* that incorporated *Frisc*o's protected expression is a separate work under 17 U.S.C. § 101 and a separate unauthorized derivative work under 17 U.S.C. § 106(2). These include the May Draft, the September Draft, the Awards Draft, and, on information and belief, earlier drafts not yet produced. Each copy of each draft that Defendants made or transmitted is a separate unauthorized reproduction under § 106(1), and each draft distributed to others is an unauthorized distribution under § 106(3). This includes copies delivered to Miramax and to producers, cast, and crew, and copies of the Awards Draft distributed to awards voters and members of the entertainment industry.

273. Defendants copied protected expression from *Frisco* and adapted that expression into drafts of *The Holdovers*, the completed screenplay, the motion picture, and other derivative materials.

274. As alleged herein, *The Holdovers* is substantially similar to *Frisco* in myriad ways, including with respect to overall story progression, narrative structure, character relationships, sequence of events, scene construction, dialogue architecture, thematic development, pacing, and the selection and arrangement of expressive elements.

275. By preparing each draft of *The Holdovers*, and by creating, producing, distributing, and exploiting the completed screenplay and Film, Defendants infringed Plaintiff's exclusive rights to reproduce *Frisco* and to prepare derivative works based upon *Frisco*, in violation of 17 U.S.C. §§ 106(1), 106(2), and 501.

276. *The Holdovers* is an unauthorized derivative work based on *Frisco*.

277. Defendants infringed Plaintiff's exclusive rights under 17 U.S.C. § 106

by, among other things:

i. Reproducing copyrighted portions of *Frisco*;

ii. Preparing derivative works based upon *Frisco*;

iii. Distributing copies and derivative works derived from *Frisco*;

iv. Publicly performing and publicly displaying works derived from *Frisco*; and

v. Licensing, marketing, promoting, and commercially exploiting works derived from *Frisco*.

278. Defendants Alexander Payne, David Hemingson, Mark Johnson, Gran Via, Honest Scholar, Miramax, Miramax Parent, Focus, UPHE, NBCUniversal, and DOES 1 through 10 participated in, authorized, reproduced, prepared, distributed, licensed, marketed, promoted, exploited, benefited from, or otherwise engaged in conduct constituting copyright infringement.

279. On information and belief, Miramax and/or Miramax Parent reproduced, distributed, and used drafts of *The Holdovers* in developing, financing, casting, and producing the Film, including drafts that predate the May Draft.

280. On information and belief, Johnson and Gran Via reproduced, distributed, and used drafts of *The Holdovers* in developing and producing the Film.

281. Honest Scholar and Miramax, through the chain of title alleged above, authorized and continue to authorize the reproduction, distribution, public performance, and licensing of *The Holdovers*, and derive revenue from its exploitation.

282. Focus distributed *The Holdovers* theatrically in the United States and, on information and belief, internationally, and participated in licensing it for streaming.

283. NBCUniversal, through UFEG, exhibited the Film on Peacock and licensed it for further exhibition. UPHE reproduced and distributed the Film on Blu-ray, DVD, and digital formats.

284. Defendants' infringement has been and continues to be ongoing through the continued production, reproduction, distribution, licensing, streaming, digital distribution, physical-media distribution, television exhibition, public performance, advertising, promotion, and exploitation of *The Holdovers*.

285. Each unauthorized reproduction, adaptation, distribution, license, public performance, stream, exhibition, rental, sale, or other exploitation of *The Holdovers* constitutes a separate act of infringement.

286. Stephenson commenced this action within three years after he discovered, or reasonably should have discovered, Defendants' infringement. Independently, Defendants committed separate acts of infringement within the three years preceding the filing of this action, including unauthorized reproduction, distribution, and public performance of *The Holdovers* through theatrical exhibition, home entertainment, and streaming. Each such act gives rise to a separately accruing claim. Defendants' concealment of their copying, including the removal of *Frisco*'s title and authorship information and of telltale details from successive drafts, independently tolls the limitations period.

287. As a direct and proximate result of Defendants' infringement, Plaintiff has suffered and continues to suffer damages, including lost licensing opportunities, lost compensation, loss of authorship recognition, lost business and professional opportunities, and diminution in the value of Plaintiff's copyrighted work.

288. To the extent alleged herein, Defendants who knew or had reason to know of the infringing conduct of others and induced, caused, or materially contributed to that conduct are liable for contributory infringement. Such Defendants materially contributed to the infringement by participating in and facilitating the development, production, reproduction, distribution, licensing, exhibition, and exploitation of *The Holdovers*. Defendants who possessed the right and ability to supervise or control the infringing conduct of others and derived a direct financial benefit from that conduct are further liable for vicarious

infringement. Accordingly, as applicable to their respective conduct alleged herein, Defendants have directly, contributorily, and/or vicariously infringed Stephenson's copyrighted work.

289. Defendants' infringement was willful and undertaken in conscious disregard of Stephenson's rights under the federal Copyright Act.

290. Defendants have obtained and continue to obtain revenues, profits, licensing fees, economic benefits, professional benefits, and other advantages attributable to their infringement.

291. Pursuant to 17 U.S.C. § 504(b), Plaintiff is entitled to recover Plaintiff's actual damages and Defendants' profits attributable to the infringement in an amount to be proven at trial.

292. Defendants' conduct is causing, and unless enjoined by this Court, will continue to cause Plaintiff great and irreparable injury that cannot fully be compensated for or measured in money, such that Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting further infringements of his exclusive rights under copyright.

## SECOND CLAIM FOR RELIEF

**(For Violations of 17 U.S.C. § 1202 against Alexander Payne)**

293. Plaintiff repeats and realleges each of the preceding allegations as though fully set forth herein.

294. Payne received *Frisco* twice: the 2013 Draft, given to his producing partner Jim Burke in August 2013, and the 2019 Draft, submitted by John Woodward in 2019 (together, the "*Frisco* Copies"). The title page of each identified the work by its title, *Frisco*, and identified Plaintiff Simon Stephenson as its author. That title and author information is copyright-management information within the meaning of 17 U.S.C. § 1202(c)(2) and (3).

295. Plaintiff did not authorize Payne, or any person acting at Payne's direction or on Payne's behalf, to remove, alter, replace, or conceal the title *Frisco*,

Simon Stephenson's authorship information, or other CMI conveyed in connection with copies of *Frisco*.

296. Plaintiff is informed and believes that Payne, or a person acting at his direction, intentionally removed *Frisco*'s title page and authorship information from one or both of the *Frisco* Copies, leaving the screenplay's text otherwise intact. Because the 2013 Draft and the 2019 Draft are materially identical, the *Frisco* material incorporated into *The Holdovers* is consistent with the use of either copy. Payne knew, or had reasonable grounds to know, that the removal would conceal the source of the material and enable or facilitate its unauthorized use in developing *The Holdovers*. That conduct violates 17 U.S.C. § 1202(b)(1).

297. Plaintiff is informed and believes that any removal, omission, alteration, or concealment of *Frisco*'s title, Stephenson's authorship information, or other copyright-management information occurred without Stephenson's authorization.

298. On information and belief, Payne then distributed that copy, or material taken from it, to Hemingson or others working on *The Holdovers*, knowing that its copyright-management information had been removed without authority. Payne knew, or had reasonable grounds to know, that the distribution would enable, facilitate, or conceal infringement, in violation of 17 U.S.C. § 1202(b)(3).

299. Plaintiff bases these beliefs in part on Payne's receipt of the *Frisco* Copies; Payne's acknowledged role in supplying material to Hemingson and rewriting the screenplay; the "medical conference" line and other remnants of *Frisco* in the earlier drafts of *The Holdovers*, and the substantial similarities alleged throughout this Complaint, particularly the parallel plot points, sequences of events, and other structural similarities.

300. By the foregoing conduct, Alexander Payne violated 17 U.S.C. § 1202(b)(1), (2), and/or (3).

301. As a direct and proximate result of these violations, Plaintiff has

suffered damages and is entitled to recover actual damages and Defendants' profits, or statutory damages, together with costs and reasonable attorneys' fees, under 17 U.S.C. § 1203.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Simon Stephenson respectfully requests that judgment be entered in his favor and against the Defendants identified in each applicable Claim for Relief, and that the Court award the following relief:

1. An award of Plaintiff's actual damages resulting from Defendants' copyright infringement and contributory and vicarious copyright infringement, together with any profits of Defendants attributable to the infringement that are not taken into account in computing Plaintiff's actual damages, pursuant to 17 U.S.C. § 504(b), in an amount to be proven at trial;

2. An award of Plaintiff's actual damages and any profits attributable to violations of 17 U.S.C. § 1202, or, at Plaintiff's election and to the extent permitted by law, statutory damages for each violation pursuant to 17 U.S.C. § 1203;

3. Preliminary and permanent injunctive relief, as permitted by law, enjoining Defendants and their officers, agents, servants, employees, representatives, licensees, distributors, and all persons acting in concert or participation with them from further infringing Plaintiff's copyright in *Frisco*, violating 17 U.S.C. § 1202, or otherwise engaging in the unlawful conduct alleged herein, including further unauthorized reproduction, distribution, licensing, public performance, public display, or other exploitation of material copied or derived from *Frisco*;

4. Such further restitutionary, injunctive, and other equitable relief as the Court deems appropriate, including relief necessary to prevent Defendants' continued unauthorized exploitation of Plaintiff's copyrighted work and to prevent Defendants from retaining benefits wrongfully obtained from Plaintiff;

5. An award of Plaintiff's reasonable attorneys' fees and costs to the

extent authorized by 17 U.S.C. § 1203 and any other applicable law;

6. An award of pre-judgment and post-judgment interest at the maximum rate permitted by law;

7. An award of Plaintiff's costs of suit; and

8. Such other and further legal and equitable relief as the Court deems just and proper.

DATED: October 28, 2026

Julia B. Cherlow
Desiree Moshayedi
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By: ______________________
Julia B. Cherlow
Attorneys for Plaintiff Simon Stephenson

**DEMAND FOR A JURY TRIAL**

By his undersigned attorneys, Plaintiff hereby demands a jury trial.

DATED: October 28, 2026

Julia B. Cherlow
Desiree Moshayedi
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By: /s/ Julia B. Cherlow

Julia B. Cherlow
Attorneys for Plaintiff Simon Stephenson